# YOUNG *v.* UNITED STATES EX REL. VUITTON ET FILS S. A. ET AL.

No. 85–1329.   Argued January 13, 1987—Decided May 26, 1987*

*Together with No. 85–6207, *Klayminc* v. *United States ex rel. Vuitton et Fils S. A. et al.*, also on certiorari to the same court.

788

BRENNAN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, and IV, in which REHNQUIST, C. J., and MARSHALL, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined, and an opinion with respect to Part III–B, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 814. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 815. POWELL, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and O'CONNOR, J., joined, *post*, p. 825. WHITE, J., filed a dissenting opinion, *post*, p. 827.

*James A. Cohen* argued the cause for petitioners. With him on the briefs were *Leonard J. Comden* and *William Weininger.*

*Deputy Solicitor General Bryson* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Trott, Edwin S. Kneedler,* and *Gloria C. Phares.*

*J. Joseph Bainton* argued the cause for respondents. With him on the brief was *Robert P. Devlin.*

JUSTICE BRENNAN delivered the opinion of the Court with respect to Parts I, II, III–A, and IV, and an opinion with respect to Part III–B, in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join.

Petitioners in these cases were found guilty of criminal contempt by a jury, pursuant to 18 U. S. C. § 401(3), for their

violation of the District Court's injunction prohibiting infringement of respondent's trademark. They received sentences ranging from six months to five years.[1] On appeal to the Court of Appeals for the Second Circuit, petitioners urged that the District Court erred in appointing respondent's attorneys, rather than a disinterested attorney, to prosecute the contempt. The Court of Appeals affirmed, 780 F. 2d 179 (1985), and we granted certiorari, 477 U. S. 903 (1986). We now reverse, exercising our supervisory power, and hold that counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order.

I

The injunction that petitioners violated in these cases is a result of the settlement of a lawsuit brought in December 1978, in the District Court for the Southern District of New York, by Louis Vuitton, S. A., a French leather goods manufacturer, against Sol Klayminc, his wife Sylvia, his son Barry (the Klaymincs), and their family-owned businesses, Karen Bags, Inc., Jade Handbag Co., Inc., and Jak Handbag, Inc. Vuitton alleged in its suit that the Klaymincs were manufacturing imitation Vuitton goods for sale and distribution. Vuitton's trademark was found valid in *Vuitton et Fils S. A.* v. *J. Young Enterprises, Inc.*, 644 F. 2d 769 (CA9 1981), and Vuitton and the Klaymincs then entered into a settlement agreement in July 1982. Under this agreement, the Klaymincs agreed to pay Vuitton $100,000 in damages, and consented to the entry of a permanent injunction prohibiting them from, *inter alia*, "manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any product bearing any simulation, reproduction, counterfeit, copy, or colorable imitation" of

---

[1] Petitioners' sentences were as follows: Sol Klayminc, 5 years; Gerald Young, 2½ years; Barry Klayminc, 9 months; George Cariste, 9 months; Nathan Helfand, 6 months. App. 162–164.

Vuitton's registered trademark. App. to Pet. for Cert. 195–A to 196–A.

In early 1983, Vuitton and other companies concerned with possible trademark infringement were contacted by a Florida investigation firm with a proposal to conduct an undercover "sting" operation. The firm was retained, and Melvin Weinberg and Gunner Askeland, two former Federal Bureau of Investigation agents, set out to pose as persons who were interested in purchasing counterfeit goods. Weinberg expressed this interest to petitioner Nathan Helfand, who then discussed with Klayminc and his wife the possibility that Weinberg and Askeland might invest in a Haitian factory devoted to the manufacture of counterfeit Vuitton and Gucci goods. Klayminc signed documents that described the nature of the factory operation and that provided an estimate of the cost of the counterfeited goods. In addition, Klayminc delivered some sample counterfeit Vuitton bags to Helfand for Weinberg and Askeland's inspection.

Four days after Helfand met with Klayminc, on March 31, 1983, Vuitton attorney J. Joseph Bainton requested that the District Court appoint him and his colleague Robert P. Devlin as special counsel to prosecute a criminal contempt action for violation of the injunction against infringing Vuitton's trademark. App. 18. Bainton's affidavit in support of this request recounted the developments with Helfand and Klayminc and pointed out that he and Devlin previously had been appointed by the court to prosecute Sol Klayminc for contempt of an earlier preliminary injunction in the Vuitton lawsuit. Bainton also indicated that the next step of the "sting" was to be a meeting among Sol and Barry Klayminc, Weinberg, and Askeland, at which Sol was to deliver 25 counterfeit Vuitton handbags. Bainton sought permission to conduct and videotape this meeting, and to continue to engage in undercover investigative activity.

The court responded to Bainton on the day of this request. It found probable cause to believe that petitioners were en-

gaged in conduct contumacious of the court's injunctive order, and appointed Bainton and Devlin to represent the United States in the investigation and prosecution of such activity, as proposed in Bainton's affidavit. *Id.*, at 27. A week after Bainton's appointment, on April 6, the court suggested that Bainton inform the United States Attorney's Office of his appointment and the impending investigation. Bainton did so, offering to make available any tape recordings or other evidence, but the Chief of the Criminal Division of that Office expressed no interest beyond wishing Bainton good luck.

Over the course of the next month, more than 100 audio and video tapes were made of meetings and telephone conversations between petitioners and investigators. On the basis of this evidence, Bainton requested, and the District Court signed, an order on April 26 directing petitioners to show cause why they and other parties should not be cited for contempt for either violating or aiding and abetting the violation of the court's July 1982 permanent injunction. App. to Pet. for Cert. 205–A. Petitioners' pretrial motions opposing the order to show cause and the appointment of Bainton and Devlin as special prosecutors were denied, *United States ex rel. Vuitton et Fils S. A.* v. *Karen Bags, Inc.*, 592 F. Supp. 734 (SDNY 1984), and two of the defendants subsequently entered guilty pleas. Sol Klayminc ultimately was convicted, following a jury trial, of criminal contempt under 18 U. S. C. §401(3),[2] and the other petitioners were convicted of aiding and abetting that contempt. The trial court denied their post-trial motions. *United States ex rel. Vuitton et Fils S. A.* v. *Karen Bags, Inc.*, 602 F. Supp. 1052 (SDNY 1985).

---

[2] That provision states: "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

On appeal to the Court of Appeals for the Second Circuit petitioners argued, *inter alia*, that the appointment of Bainton and Devlin as special prosecutors violated their right to be prosecuted only by an impartial prosecutor. The court rejected their contention, 780 F. 2d 179 (1985), citing its decision in *Musidor, B. V. v. Great American Screen*, 658 F. 2d 60 (1981), cert. denied, 455 U. S. 944 (1982).[3] It suggested that an interested attorney will often be the only source of information about contempts occurring outside the court's presence, 780 F. 2d, at 183, and stated that the supervision of contempt prosecutions by the judge is generally sufficient to prevent the "danger that the special prosecutor will use the threat of prosecution as a bargaining chip in civil negotiations . . . ." *Id.*, at 184. Furthermore, the court stated that the authority to prosecute encompasses the authority to engage in necessary investigative activity such as the "sting" conducted in this case. *Id.*, at 184–185. The Court of Appeals therefore affirmed petitioners' contempt convictions.

## II

### A

Petitioners first contend that the District Court lacked authority to appoint *any* private attorney to prosecute the contempt action against them, and that, as a result, only the United States Attorney's Office could have permissibly brought such a prosecution. We disagree. While it is true that Federal Rule of Criminal Procedure 42(b) does not provide authorization for the appointment of a private attorney, it is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt.

---

[3] That case held that it was proper for the District Court to appoint as special prosecutor the counsel for plaintiffs in a civil action who were the beneficiaries of the injunction allegedly violated.

By its terms, Rule 42(b) speaks only to the procedure for *providing notice* of criminal contempt.[4]   The court is required to "state the essential facts constituting the criminal contempt charged and describe it as such."   This notice must be given by the judge in open court, "or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest."   The Rule's reference to the appointment of a private attorney to submit a show cause order assumes a *pre-existing practice* of private prosecution of contempts, but does not itself purport to serve as authorization for that practice.[5]   Rule 42(b) simply requires that, when a private prosecutor is appointed, sufficient notice must be provided that the contempt proceeding is criminal in nature.[6]

---

[4] The Rule provides in relevant part:

"(b) Disposition Upon Notice and Hearing.   A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such.   The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest."

[5] See Wright, Byrne, Haakh, Westbrook, & Wheat, Civil and Criminal Contempt in the Federal Courts, 17 F. R. D. 167, 172 (1955) ("Before the Fed. R. Crim. P., private parties were entitled to prosecute criminal contempt actions").

[6] Respondents claim that the reference to the appointment of an attorney to request a show cause order is meant to bestow authority on the court to appoint a private prosecutor.   In support of this proposition they point to the Advisory Committee Notes, which cite with approval the decision in *McCann* v. *New York Stock Exchange,* 80 F. 2d 211 (CA2 1935), cert. denied, 299 U. S. 603 (1936).

In *McCann,* Judge Learned Hand expressed concern that the practice of using private attorneys to prosecute contempt actions might leave defendants unclear about whether the proceeding against them was civil or criminal, 80 F. 2d, at 214, and declared the need for "some simple and certain test by which the character of the prosecution can be determined." *Ibid.*

The Rule's assumption that private attorneys may be used to prosecute contempt actions reflects the longstanding acknowledgment that the initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function. As this Court declared in *Michaelson* v. *United States ex rel. Chicago, St. P., M., & O. R. Co.*, 266 U. S. 42 (1924):

> "That the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice. The courts of the United States, when called into existence and vested with jurisdiction over any subject, at once became possessed of the power." *Id.*, at 65–66.[7]

Judge Hand suggested that if the trial court decides to use the attorney of a party to the underlying dispute to prosecute the action, the criminal nature of the proceeding would be made plain by the entry of an order directing the attorney to prosecute the defendant criminally on behalf of the court. *Ibid.*

The Advisory Committee's Notes to Rule 42(b), 18 U. S. C. App., p. 644, state: "The requirement *in the second sentence that the notice shall describe the criminal contempt as such* is intended to obviate the frequent confusion between criminal and civil contempt proceedings and follows the suggestion made in *McCann* v. *New York Stock Exchange,* 80 F. 2d 211 [(CA2 1935)]" (emphasis added). This passage makes clear that Rule 42(b) was intended to respond to Judge Hand's general exhortation that the defendant be plainly advised if a contempt proceeding is to be criminal in nature. The requirement of detailed notice in the second sentence serves this purpose. As this Court said in *United States* v. *Mine Workers,* 330 U. S. 258 (1947), Rule 42(b) "was designed to insure a realization by contemnors that a prosecution for criminal contempt is contemplated," *id.,* at 298, and "[t]he rule in this respect follows the suggestion made in *McCann.*" *Id.,* at 298, n. 66. The Notes give no indication, however, that the reference in the *third* sentence of the Rule to the use of private attorneys to serve notice by means of a show cause order was intended to codify *McCann*'s suggestion that private attorneys be appointed as prosecutors.

[7] See also *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 450 (1911) ("[T]he power of courts to punish for contempts is a necessary and

The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls 'the judicial power of the United States' would be a mere mockery." *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 450 (1911). As a result, "there could be no more important duty than to render such a decree as would serve to vindicate the jurisdiction and authority of courts to enforce orders and to punish acts of disobedience." *Ibid.* Courts cannot be at the mercy of another Branch in deciding whether such proceedings should be initiated. The ability to appoint a private attorney to prosecute a contempt action satisfies the need for an independent means of self-protection, without which courts would be "mere boards of arbitration whose judgments and decrees would be only advisory." *Ibid.*[8]

integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law"); *Ex parte Robinson*, 19 Wall. 505, 510 (1874) ("The power to punish for contempts is inherent in all courts"); J. Fox, History of Contempt of Court 1 (1927) ("Contempt of Court . . . has been a recognized phrase in English law [since] the twelfth century"); R. Goldfarb, Contempt Power 9 (1963) ("The power of courts to punish contempts is one which wends historically back to the early days of England and the crown"); 1 J. Kent, Commentaries on American Law *300, n. b (commenting on "immemorially exercised discretion of the courts in respect to contempts"). The power to initiate a contempt proceeding has of necessity encompassed the authority to appoint an attorney to prosecute such a matter. See, *e. g., United States ex rel. Brown* v. *Lederer*, 140 F. 2d 136, 138 (CA7), cert. denied, 322 U. S. 734 (1944); *Western Fruit Growers, Inc.* v. *Gotfried*, 136 F. 2d 98, 100–101 (CA9 1943).

[8] JUSTICE SCALIA's concurrence suggests that our precedents regarding a court's inherent contempt authority have lost their force because of our decision in *Bloom* v. *Illinois*, 391 U. S. 194 (1968). *Post*, at 823–824. The argument is that since *Bloom* rejected the holding in *In re Debs*, 158 U. S. 564 (1895), that courts have inherent power summarily to punish serious contempts, and since the cases between *Bloom* and *Debs* assumed the

## B

Petitioners contend that the ability of courts to initiate contempt prosecutions is limited to the summary punishment of in-court contempts that interfere with the judicial process. They argue that out-of-court contempts, which require prosecution by a party other than the court, are essentially conventional crimes, prosecution of which may be initiated only by the Executive Branch.

existence of this summary power, these precedents cannot provide guidance for a court's authority with respect to contempts of court. These precedents, however, both acknowledge the inherent power of a court to institute contempt proceedings, and assume that in such proceedings the court may summarily determine guilt with respect to serious criminal contempts. *Bloom* held that the second assumption was incorrect, but did nothing to undermine the first. *Bloom's* rejection of arguments regarding the need to vindicate judicial authority relates solely to exercise of the summary contempt power. See 391 U. S., at 208 ("[W]hen serious punishment for contempt is contemplated, rejecting a demand for jury trial cannot be squared with . . . the desirability of vindicating the authority of the court"); *ibid.* ("We place little credence in the notion that the independence of the judiciary hangs on the power to try contempts summarily"). That case therefore cannot justify ignoring our consistent pronouncements on the inherent authority of a court to institute contempt proceedings.

Nor is it the case that "as a practical matter the impairment of judicial power produced by requiring the Executive to prosecute contempts is no more substantial than the impairment produced by requiring a jury." *Post*, at 824. The concern about impairment of a court's authority is based on the fear that an alleged contemnor will consider himself or herself beyond the reach of the law. As we said in *Gompers, supra:*

"If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." 221 U. S., at 450.

The need to vindicate a court's authority is thus satisfied by ensuring that an alleged contemner will have to account for his or her behavior in a legal proceeding, regardless of whether the party is ultimately convicted or acquitted. A court's ability to institute a contempt proceeding is therefore essential to the vindication of its authority in a way that the ability to determine guilt or innocence is not.

The underlying concern that gave rise to the contempt power was not, however, merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial. See *Bessette* v. *W. B. Conkey Co.*, 194 U. S. 324, 333 (1904) (contempt power "has been uniformly held to be necessary to the protection of the court from insults and oppressions while in the ordinary course of its duties, *and* to enable it to enforce its judgments and orders necessary to the due administration of law and the protection of the rights of suitors") (emphasis added); *Ex parte Robinson*, 19 Wall. 505, 510 (1874) (existence of contempt power "essential to the preservation of order in judicial proceedings, *and* to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice") (emphasis added); *Anderson* v. *Dunn*, 6 Wheat. 204, 227 (1821) (courts by their creation vested with power "to impose silence, respect, and decorum in their presence, *and* submission to their lawful mandates") (emphasis added).

The distinction between in-court and out-of-court contempts has been drawn not to define when a court has or has not the authority to initiate prosecution for contempt, but for the purpose of prescribing what procedures must attend the exercise of that authority. As we said in *Bloom* v. *Illinois*, 391 U. S. 194, 204 (1968), "[b]efore the 19th century was out, a distinction had been carefully drawn between contempts occurring within the view of the court, for which a hearing and formal presentation of evidence were dispensed with, and all other contempts where more normal adversary procedures were required." Thus, for instance, this Court has found that defendants in criminal contempt proceedings must be presumed innocent, proved guilty beyond a reasonable doubt, and accorded the right to refuse to testify against themselves, *Gompers, supra,* at 444; must be advised of

charges, have a reasonable opportunity to respond to them, and be permitted the assistance of counsel and the right to call witnesses, *Cooke* v. *United States*, 267 U. S. 517, 537 (1925); must be given a public trial before an unbiased judge, *In re Oliver*, 333 U. S. 257 (1948); and must be afforded a jury trial for serious contempts, *Bloom, supra.* Congress also has regulated the manner in which courts exercise their power to prosecute contempts, narrowing the class of contempts subject to summary punishment, Act of Mar. 2, 1831, 4 Stat. 487. Furthermore, Rule 42 itself distinguishes between contempt committed in the presence of the court, which may be summarily punished, and all other contempts, which may be punished only upon notice and hearing.[9]

The manner in which the court's prosecution of contempt is exercised therefore may be regulated by Congress, *Michaelson*, 266 U. S., at 65–66, and by this Court through constitutional review, *Bloom, supra*, at 201–208, or supervisory power, *Cheff* v. *Schnackenberg*, 384 U. S. 373, 384 (1966). However, while the exercise of the contempt power is subject to reasonable regulation, "the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative." *Michaelson, supra*, at 66. Thus, while the prosecution of in-court and out-of-court contempts must proceed in a different manner, they both proceed at the instigation of the court.

The fact that we have come to regard criminal contempt as "a crime in the ordinary sense," *Bloom, supra*, at 201, does not mean that any prosecution of contempt must now be con-

---

[9] These measures, carefully instituted over time on the basis of experience with contempt proceedings, undercut JUSTICE SCALIA's argument that court appointment of contempt prosecutors raises the prospect of "'the most tyrannical licentiousness,'" *post*, at 822 (quoting *Anderson* v. *Dunn*, 6 Wheat. 204, 228 (1821)), representing a situation in which "judge[s] in effect mak[e] the laws, prosecut[e] their violation, and si[t] in judgment of those prosecutions," *post*, at 822, and in which we "permi[t] a judge to promulgate a rule of behavior, prosecute its violation, and adjudicate whether the violation took place." *Post*, at 824.

sidered an execution of the criminal law in which only the Executive Branch may engage. Our insistence on the criminal character of contempt prosecutions has been intended to rebut earlier characterizations of such actions as undeserving of the protections normally provided in criminal proceedings. See, *e. g.*, *In re Debs*, 158 U. S. 564, 596 (1895) (no jury trial in criminal contempt actions because a court in such a case is "only securing to suitors the rights which it has adjudged them entitled to"). That criminal procedure protections are now required in such prosecutions should not obscure the fact that these proceedings are not intended to punish conduct proscribed as harmful by the general criminal laws. Rather, they are designed to serve the limited purpose of vindicating the authority of the court. In punishing contempt, the Judiciary is sanctioning conduct that violates specific duties imposed by the court itself, arising directly from the parties' participation in judicial proceedings.[10]

Petitioners' assertion that the District Court lacked authority to appoint a private attorney to prosecute the contempt action in these cases is thus without merit. While contempt proceedings are sufficiently criminal in nature to warrant the imposition of many procedural protections, their fundamental purpose is to preserve respect for the judicial system itself. As a result, courts have long had, and must

---

[10] JUSTICE SCALIA's concurrence suggests that the logic of resting a court's ability to institute a contempt proceeding on the need to vindicate the court's authority would support "an inherent power on the part of Congress to prosecute and punish disobedience of its laws." *Post*, at 821. A court's authority is inherently limited, however, by the nature of the judicial power, for the court has jurisdiction in a contempt proceeding only over those particular persons whose legal obligations result from their earlier participation in proceedings before the court. By contrast, the congressional prosecutorial power the concurrence hypothesizes would admit of no such limit; the parties potentially subject to such power would include the entire population. Acknowledging the limited authority of courts to appoint contempt prosecutors thus provides no principle that can be wielded to eradicate fundamental separation-of-powers boundaries.

continue to have, the authority to appoint private attorneys to initiate such proceedings when the need arises.

## C

While a court has the authority to initiate a prosecution for criminal contempt, its exercise of that authority must be restrained by the principle that "only '[t]he least possible power adequate to the end proposed' should be used in contempt cases." *United States* v. *Wilson*, 421 U. S. 309, 319 (1975) (quoting *Anderson* v. *Dunn*, 6 Wheat., at 231). We have suggested, for instance, that, when confronted with a witness who refuses to testify, a trial judge should first consider the feasibility of prompting testimony through the imposition of civil contempt, utilizing criminal sanctions only if the civil remedy is deemed inadequate. *Shillitani* v. *United States*, 384 U. S. 364, 371, n. 9 (1966).

This principle of restraint in contempt counsels caution in the exercise of the power to appoint a private prosecutor. We repeat that the rationale for the appointment authority is necessity. If the Judiciary were completely dependent on the Executive Branch to redress direct affronts to its authority, it would be powerless to protect itself if that Branch declined prosecution. The logic of this rationale is that a court ordinarily should first request the appropriate prosecuting authority to prosecute contempt actions, and should appoint a private prosecutor only if that request is denied. Such a procedure ensures that the court will exercise its inherent power of self-protection only as a last resort.

In practice, courts can reasonably expect that the public prosecutor will accept the responsibility for prosecution. Indeed, the United States Attorney's Manual § 9–39.318 (1984) expressly provides: "In the great majority of cases the dedication of the executive branch to the preservation of respect for judicial authority makes the acceptance by the U. S. Attorney of the court's request to prosecute a mere formality . . . ." Referral will thus enhance the prospect that investi-

gative activity will be conducted by trained prosecutors pursuant to Justice Department guidelines.[11]

In this case, the District Court did not first refer the case to the United States Attorney's Office before the appointment of Bainton and Devlin as special prosecutors.[12] We need not address the ramifications of that failure, however. Even if a referral had been made, we hold, in the exercise of our supervisory power, that the court erred in appointing as prosecutors counsel for an interested party in the underlying civil litigation.

## III

### A

In *Berger* v. *United States*, 295 U. S. 78, 88 (1935), this Court declared:

---

[11] See FBI Undercover Activities, Authorization, and H. R. 3232: Oversight Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 98th Cong., 1st Sess., 264–374 (1983) (setting forth Attorney General's detailed guidelines for conduct of undercover investigations).

[12] Bainton did send the following letter to the United States Attorney's Office one week after his appointment as special prosecutor:

"Dear Mr. Pedowitz:

"At the suggestion of Judge Brieant, I am bringing to your attention an order signed by Judge Lasker in Judge Brieant's absence in the above-entitled criminal contempt proceedings, together with an affidavit of mine submitted in support of that order.

"The criminally contumacious events predicted in my affidavit have come to pass. Should anyone from your office have any interest in this matter I am obviously willing to make the tape recordings and other evidence available for your review in a manner which will not compromise its chain of custody.

"Very truly yours,
"J. Joseph Bainton"

App. 64.

This letter plainly was not sent to request the United States Attorney's Office to prosecute the contempt; rather it was simply notice to that office that Bainton would be prosecuting the action.

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer."

This distinctive role of the prosecutor is expressed in Ethical Consideration (EC) 7–13 of Canon 7 of the American Bar Association (ABA) Model Code of Professional Responsibility (1982): "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."

Because of this unique responsibility, federal prosecutors are prohibited from representing the Government in any matter in which they, their family, or their business associates have any interest. 18 U. S. C. § 208(a).[13] Furthermore, the Justice Department has applied to its attorneys the ABA Model Code of Professional Responsibility, 28 CFR

---

[13] Section 208(a) provides:

"Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, partner, organization in which he is serving as officer, director, trustee, partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest —

"Shall be fined not more than $10,000, or imprisoned not more than two years, or both."

45.735–1(b) (1986), which contains numerous provisions relating to conflicts of interest.[14]  The concern that representation of other clients may compromise the prosecutor's pursuit of the Government's interest rests on recognition that a prosecutor would owe an ethical duty to those other clients.  "Indeed, it is the highest claim on the most noble advocate which causes the problem—fidelity, unquestioned, continuing fidelity to the client."  *Brotherhood of Locomotive Firemen & Enginemen* v. *United States,* 411 F. 2d. 312, 319 (CA5 1969).

Private attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated.  As we said in *Gompers,* criminal contempt proceedings arising out of civil litigation "are between the public and the defendant, and are not a part of the original cause."  221 U. S., at 445.  The prosecutor is appointed solely to pursue the public interest in vindication of the court's authority.  A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution.[15]

---

[14] See, *e. g.,* Disciplinary Rule (DR) 5–105 (lawyer should refuse to accept or continue employment if the interests of another client may impair the exercise of his or her independent judgment); EC 5–1 (professional judgment of lawyer should be exercised solely for the benefit of client, free of "compromising influences and loyalties"); EC 5–2 (lawyer should not accept proffered employment if reasonable probability that personal interests will "affect adversely the advice to be given or services to be rendered the prospective client"); EC 5–14 (independent professional judgment compromised when lawyer asked to represent two or more clients "who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant"); EC 5–15 (if possibility of conflict in representation of multiple clients, lawyer "should resolve all doubts against the propriety of the representation"); EC 9–6 (lawyer has duty to avoid "not only professional impropriety but also the appearance of impropriety").  See also United States Attorney's Manual § 10–2.664 (1984) (cautioning against activity that "creates or appears to create a conflict of interest").

[15] Furthermore, aside from any concern for the standards to which prosecutors are held, the attorney for an interested party who prosecutes a

If a Justice Department attorney pursued a contempt prosecution for violation of an injunction benefiting any client of that attorney involved in the underlying civil litigation, that attorney would be open to a charge of committing a felony under § 208(a). Furthermore, such conduct would violate the ABA ethical provisions, since the attorney could not discharge the obligation of undivided loyalty to both clients where both have a direct interest.[16] The Government's interest is in dispassionate assessment of the propriety of criminal charges for affronts to the Judiciary. The private party's interest is in obtaining the benefits of the court's order. While these concerns sometimes may be congruent, sometimes they may not. A prosecutor may be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client. Conversely, a prosecutor may be tempted to abandon a meritorious prosecution if a settlement providing benefits to the private client is conditioned on a recommendation against criminal charges.

Regardless of whether the appointment of private counsel in this case resulted in any prosecutorial impropriety (an issue on which we express no opinion), that appointment illustrates the *potential* for private interest to influence the discharge of public duty. Vuitton's California litigation had culminated in a permanent injunction and consent decree in favor of Vuitton against petitioner Young relating to various trademark infringement activities. This decree contained a liquidated damages provision of $750,000 for violation of the injunction. The prospect of such a damages award had the potential to influence whether Young was selected as a target

---

contempt action must reckon with the proscriptions on conflicts of interest applicable to all lawyers. See n. 11, *supra.*

[16] See, *e. g.,* EC 5-1, *supra;* EC 5-18 ("A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization").

of investigation, whether he might be offered a plea bargain, or whether he might be offered immunity in return for his testimony. In addition, Bainton was the defendant in a defamation action filed by Klayminc arising out of Bainton's involvement in the litigation resulting in the injunction whose violation was at issue in this case. This created the possibility that the investigation of Klayminc might be shaped in part by a desire to obtain information useful in the defense of the defamation suit. Furthermore, Vuitton had various civil claims pending against some of the petitioners. These claims theoretically could have created temptation to use the criminal investigation to gather information of use in those suits, and could have served as bargaining leverage in obtaining pleas in the criminal prosecution. In short, as will generally be the case, the appointment of counsel for an interested party to bring the contempt prosecution in this case at a minimum created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety.[17]

---

[17] The potential for misconduct that is created by the appointment of an interested prosecutor is not outweighed by the fact that counsel for the beneficiary of the court order may often be most familiar with the allegedly contumacious conduct. That familiarity may be put to use in *assisting* a disinterested prosecutor in pursuing the contempt action, but cannot justify permitting counsel for the private party to be in control of the prosecution. Nor does a concern for reimbursement of the prosecutor support such an appointment, as the Court of Appeals for the Second Circuit suggested in *Musidor, B. V.* v. *Great American Screen,* 658 F. 2d 60, 65 (1981). The Solicitor General has represented to the Court that the General Counsel of the Administrative Office for the United States Courts has construed the statutes appropriating funds for the operation of the federal courts to permit reimbursement of legal fees to attorneys appointed as special prosecutors in contempt actions, Brief for United States as *Amicus Curiae* 25–26, and that such payments have been approved in the past at the hourly rate at which Justice Department attorneys are compensated. *Id.,* at 26, n. 20. Furthermore, the normal practice of first referring the matter to the United States Attorney's Office should minimize the number of instances in which such reimbursement is necessary.

As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives. A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court.

The requirement of a disinterested prosecutor is consistent with our recognition that prosecutors may not necessarily be held to as stringent a standard of disinterest as judges. "In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law," *Marshall* v. *Jerrico, Inc.*, 446 U. S. 238, 248 (1980). We have thus declined to find a conflict of interest in situations where the potential for conflict on the part of a judge might have been intolerable. See *id.*, at 250–252 (fact that sums collected as civil penalties returned to agency to defray administrative costs presented too remote a potential for conflict in agency enforcement efforts). Ordinarily we can only speculate whether other interests are likely to influence an enforcement officer, and it is this speculation that is informed by appreciation of the prosecutor's role. In a case where a prosecutor represents an interested party, however, the ethics of the legal profession *require* that an interest other than the Government's be taken into account. Given this inherent conflict in roles, there is no need to speculate whether the prosecutor will be subject to extraneous influence.[18]

---

[18] An arrangement represents an actual conflict of interest if its potential for misconduct is deemed intolerable. The determination whether there

As we said in *Bloom*, "In modern times, procedures in criminal contempt cases have come to mirror those used in ordinary criminal cases." 391 U. S., at 207. The requirement of a disinterested prosecutor is consistent with that trend, since "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision." [19]

The use of this Court's supervisory authority has played a prominent role in ensuring that contempt proceedings are conducted in a manner consistent with basic notions of fairness. See, *e. g.*, *Cheff*, 384 U. S., at 380 (requiring jury trial for imposition of contempt sentences greater than six months); *Yates* v. *United States*, 356 U. S. 363, 366–367 (1958) (reducing contempt sentence in light of miscalculation

is an actual conflict of interest is therefore distinct from the determination whether that conflict resulted in any actual misconduct.

It is true that prosecutors may on occasion be overzealous and become overly committed to obtaining a conviction. That problem, however, is personal, not structural. As the Court of Appeals for the Sixth Circuit said in disapproving the appointment of an interested contempt prosecutor in *Polo Fashions, Inc.* v. *Stock Buyers Int'l, Inc.*, 760 F. 2d 698, 705 (1985), cert. pending, No. 85–455, such overzealousness

"does not have its roots in a conflict of interest. When it manifests itself the courts deal with it on a case-by-case basis as an aberration. This is quite different from approving a practice which would permit the appointment of prosecutors whose undivided loyalty is pledged to a party interested only in a conviction."

[19] *Marshall* v. *Jerrico, Inc.*, 446 U. S. 238, 249–250 (1980). See *Polo Fashions, Inc.*, *supra* (appointment of interested prosecutor disapproved through exercise of supervisory authority); *Brotherhood of Locomotive Firemen & Enginemen* v. *United States*, 411 F. 2d 312, 319 (CA5 1969) (appointment of interested prosecutor characterized as due process violation). Most States have acknowledged this principle as well. "[W]hen a private attorney is also interested in related civil litigation, the majority of states will not permit him to participate in a criminal prosecution." Note, Private Prosecutors in Criminal Contempt Actions Under Rule 42(b) of the Federal Rules of Criminal Procedure, 54 Ford. L. Rev. 1141, 1155 (1986) (footnote omitted). See also *id.*, at 1154, n. 54 (listing cases).

of number of offenses committed); *Offutt* v. *United States*, 348 U. S. 11, 13, 17–18 (1954) (contempt conviction reversed in case in which judge involved in personal conflict with contemner). The exercise of supervisory authority is especially appropriate in the determination of the procedures to be employed by courts to enforce their orders, a subject that directly concerns the functioning of the Judiciary. We rely today on that authority to hold that counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order.[20]

## B

The next question we must confront is whether the Government should have the opportunity to demonstrate that it was harmless error for the court to appoint counsel for an interested party as contempt prosecutor. See *Chapman* v. *California*, 386 U. S. 18 (1967).[21] We have held that some errors "are so fundamental and pervasive that they require

---

[20] We see no need to distinguish between "serious" contempts, involving sentences exceeding six months, and other contempts in imposing this requirement. Our decision in *Bloom* v. *Illinois*, 391 U. S. 194 (1968), made such a distinction for the purpose of determining those contempt proceedings requiring a jury trial. That distinction rested, however, on recognition that historically the right to jury trial was not available for petty crimes. *Id.*, at 197–198. Aside from the right to jury trial, our decisions constituting the general trend toward greater procedural protections for defendants in contempt trials, *id.*, at 207, have not distinguished between types of contempt proceedings in imposing these protections.

[21] In this case, we rely on our supervisory authority to avoid the necessity of reaching any constitutional issues. We are mindful that "reversals of convictions under the court's supervisory power must be approached 'with some caution' and with a view toward balancing the interests involved." *United States* v. *Hasting*, 461 U. S. 499, 506–507 (1983) (citations omitted) (quoting *United States* v. *Payner*, 447 U. S. 727, 734 (1980)). Where the interest infringed is sufficiently important, however, we have not hesitated to find actual prejudice irrelevant when utilizing supervisory authority. See, *e. g.*, *Ballard* v. *United States*, 329 U. S. 187 (1946) (using supervisory power to find error in exclusion of women from grand jury, and dismissing indictment).

reversal without regard to the facts or circumstances of the particular case." *Delaware* v. *Van Arsdall*, 475 U. S. 673, 681 (1986). We find that the appointment of an interested prosecutor is such an error.

An error is fundamental if it undermines confidence in the integrity of the criminal proceeding. *Rose* v. *Clark*, 478 U. S. 570, 577–578 (1986); *Van Arsdall, supra,* at 681–682; *Vasquez* v. *Hillery*, 474 U. S. 254, 263–264 (1986). The appointment of an interested prosecutor raises such doubts. Prosecution by someone with conflicting loyalties "calls into question the objectivity of those charged with bringing a defendant to judgment." *Vasquez, supra,* at 263. It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters. We have always been sensitive to the possibility that important actors in the criminal justice system may be influenced by factors that threaten to compromise the performance of their duty. We have held, for instance, that it cannot be harmless error for racial discrimination to infect the selection of the grand jury, *Vasquez, supra;* for a petit jury to be exposed to publicity unfavorable to the defendant, *Sheppard* v. *Maxwell*, 384 U. S. 333, 351–352 (1966); or for adjudication to be performed by a judical officer faced with a conflict of interest, *Ward* v. *Village of Monroeville*, 409 U. S. 57 (1972); *Tumey* v. *Ohio*, 273 U. S. 510 (1927).

It is true that we have indicated that the standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers. See *Jerrico*, 446 U. S., at 248–250.[22] This difference in treatment is relevant to *whether* a conflict is found, however, not

---

[22] We did expressly observe in *Jerrico*, however, that "we need not say whether different considerations might be held to apply if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process." *Marshall* v. *Jerrico, Inc., supra,* at 250, n. 12.

to its gravity once identified. We may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists. Once we have drawn that conclusion, however, we have deemed the prosecutor subject to influences that undermine confidence that a prosecution can be conducted in disinterested fashion. If this is the case, we cannot have confidence in a proceeding in which this officer plays the critical role of preparing and presenting the case for the defendant's guilt.

Furthermore, appointment of an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general. The narrow focus of harmless-error analysis is not sensitive to this underlying concern. If a prosecutor uses the expansive prosecutorial powers to gather information for private purposes, the prosecution function has been seriously abused even if, in the process, sufficient evidence is obtained to convict a defendant. Prosecutors "have available a terrible array of coercive methods to obtain information," such as "police investigation and interrogation, warrants, informers and agents whose activities are immunized, authorized wiretapping, civil investigatory demands, [and] enhanced subpoena power." C. Wolfram, Modern Legal Ethics 460 (1986). The misuse of those methods "would unfairly harass citizens, give unfair advantage to [the prosecutor's personal interests], and impair public willingness to accept the legitimate use of those powers." *Ibid.* Notwithstanding this concern, the determination whether an error was harmful focuses only on "'whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction.'" *Chapman, supra,* at 23 (quoting *Fahy* v. *Connecticut,* 375 U. S. 85, 86–87 (1963)). A concern for actual prejudice in such circumstances misses the point, for what is at stake is the public perception of the integrity of our criminal justice system. "[J]ustice must satisfy the appearance of justice," *Offutt, supra,* at 14, and a prosecutor

with conflicting loyalties presents the appearance of precisely the opposite. Society's interest in disinterested prosecution therefore would not be adequately protected by harmless-error analysis, for such analysis would not be sensitive to the fundamental nature of the error committed.[23]

Appointment of an interested prosecutor is also an error whose effects are pervasive. Such an appointment calls into question, and therefore requires scrutiny of, the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision. Determining the effect of this appointment

---

[23] For this reason, "none of the [state] cases that prohibit the public prosecutor from participating in a civil trial arising out of the same facts as a pending criminal prosecution are concerned with the good faith of the prosecutor or with a showing of prejudice. Rather, the mere existence of an unethical situation is sufficient to require reversal because the potential for abuse is so great." Comment, The Outmoded Concept of Private Prosecution, 25 Am. U. L. Rev. 754, 778 (1976) (footnote omitted). See, *e. g.*, *State* v. *Burns*, 322 S. W. 2d 736, 742 (Mo. 1959) (in case involving prosecutor's conflict of interest, court "shall not attempt to weigh or measure the actual prejudice").

The situation confronted by the court in *United States* v. *Heldt*, 215 U. S. App. D. C. 206, 668 F. 2d 1238 (1981), is distinguishable from the situation in this case. In *Heldt*, defendants sought a reversal of their conviction on the ground of an alleged conflict of interest under 18 U. S. C. § 208(a) on the part of two assistant prosecutors, even though defendants had failed to move for disqualification in the trial court. The Court of Appeals held that in such circumstances defendants were required to show actual prejudice in order to obtain a reversal. *Id.*, at 244–245, 668 F. 2d, at 1276–1277. In contrast, because of the bright-line rule we establish in this case, a defendant subject to contempt prosecution by counsel for the beneficiary of the court order allegedly violated would not be *alleging* the equivalent of a violation of § 208—he or she could point to the *established fact* of one. *Heldt* would be analogous only if defendants in that case had obtained a trial court disqualification of the prosecutors in question on the ground that prosecution by them would violate § 208. If those prosecutors had nonetheless continued to participate in the prosecution, defendants would have been in the same position as defendants prosecuted in violation of the rule we establish today—they would have been subject to prosecution by prosecutors whose involvement *expressly* had been found an intolerable conflict of interest.

thus would be extremely difficult. A prosecution contains a myriad of occasions for the exercise of discretion, each of which goes to *shape* the record in a case, but few of which are *part* of the record. As we said in *Holloway* v. *Arkansas*, 435 U. S. 475, 490–491 (1978), in rejecting application of the harmless-error rule to a defense attorney's conflict in representing three codefendants:

> "In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation." (Citations omitted.)

Cf. *Vasquez*, 474 U. S., at 264 ("Once having found discrimination in the selection of a grand jury, we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted").

The case before us involves the citizen's primary adversary in a criminal proceeding, who is armed with expansive powers and wide-ranging discretion. Public confidence in the disinterested conduct of that official is essential. Harmless-

error analysis is not equal to the task of assuring that confidence. It is best suited for the review of discrete exercises of judgment by lower courts, where information is available that makes it possible to gauge the effect of a decision on the trial as a whole. In this case, however, we establish a categorical rule against the appointment of an interested prosecutor, adherence to which requires no subtle calculations of judgment. Given the fundamental and pervasive effects of such an appointment, we therefore hold that harmless-error analysis is inappropriate in reviewing the appointment of an interested prosecutor in a case such as this. Cf. *United States* v. *Sells Engineering, Inc.*, 463 U. S. 418, 432 (1983) (prosecutorial use of grand jury to elicit evidence for use in civil case "improper *per se*").

## IV

Between the private life of the citizen and the public glare of criminal accusation stands the prosecutor. That state official has the power to employ the full machinery of the state in scrutinizing any given individual. Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life. For this reason, we must have assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice. A prosecutor of a contempt action who represents the private beneficiary of the court order allegedly violated cannot provide such assurance, for such an attorney is required by the very standards of the profession to serve two masters. The appointment of counsel for Vuitton to conduct the contempt prosecution in these cases therefore was improper. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN, concurring.

I join JUSTICE BRENNAN's opinion. I would go further, however, and hold that the practice—federal or state—of

appointing an interested party's counsel to prosecute for criminal contempt is a violation of due process. This constitutional concept, in my view, requires a disinterested prosecutor with the unique responsibility to serve the public, rather than a private client, and to seek justice that is unfettered. See *Brotherhood of Locomotive Firemen & Enginemen* v. *United States*, 411 F. 2d 312, 319 (CA5 1969); see generally Note, Private Prosecutors in Criminal Contempt Actions under Rule 42(b) of the Federal Rules of Criminal Procedure, 54 Ford. L. Rev. 1141, 1146–1166 (1986).

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court that the District Court's appointment of J. Joseph Bainton and Robert P. Devlin as special counsel to prosecute petitioners for contempt of an injunction earlier issued by that court was invalid, and that that action requires reversal of petitioners' convictions. In my view, however, those appointments were defective because of a failing more fundamental than that relied upon by the Court. Prosecution of individuals who disregard court orders (except orders necessary to protect the courts' ability to function) is not an exercise of "[t]he judicial power of the United States," U. S. Const., Art. III, §§ 1, 2. Since that is the only grant of power that has been advanced as authorizing these appointments, they were void. And since we cannot know whether petitioners would have been prosecuted had the matter been referred to a proper prosecuting authority, the convictions are likewise void.

I

With the possible exception of the power to appoint inferior federal officers, which is irrelevant to the present cases,[1]

---

[1] Article II, § 2, cl. 2, provides that "Congress may *by Law* vest the Appointment of such inferior Officers, as they think proper, . . . in the Courts of Law." (Emphasis added.) There was some suggestion in the Solicitor General's brief that the appointments in the present cases might be authorized by that provision. Brief for United States as *Amicus Curiae* 17–19, and n. 14. The contention was abandoned at argument, however, Tr. of

the only power the Constitution permits to be vested in federal courts is "[t]he judicial power of the United States." Art. III, § 1. That is accordingly the only kind of power that federal judges may exercise by virtue of their Article III commissions. *Muskrat* v. *United States,* 219 U. S. 346, 354–356 (1911); *United States* v. *Ferreira,* 13 How. 40 (1852).

The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy. See Art. III, § 2. That includes the power to serve as a neutral adjudicator in a criminal case, but does not include the power to seek out law violators in order to punish them—which would be quite incompatible with the task of neutral adjudication. It is accordingly well established that the judicial power does not generally include the power to prosecute crimes. See *United States* v. *Cox,* 342 F. 2d 167 (CA5) (en banc), cert. denied, 381 U. S. 935 (1965), and authorities cited therein; 342 F. 2d, at 182 (Brown, J., concurring); *id.,* at 185 (Wisdom, J., concurring); see generally *United States* v. *Thompson,* 251 U. S. 407, 413–417 (1920). Rather, since the prosecution of law violators is part of the implementation of the laws, it is—at least to the extent that it is publicly exercised[2]—executive power, vested by the Constitution in the

Oral Arg. 26–28, and properly so, since regardless of whether Congress *could* "by law" authorize judicial appointment of an officer of this sort—a question we need not decide here—it has in fact not done so. The closest thing to a law cited by the Government was Federal Rule of Criminal Procedure 42(b), which, as the Court notes, *ante,* at 794–795, and n. 6, does not purport to bestow appointment power but rather assumes its preexistence. In any event the Rule could not confer Article II appointment authority, since it is a Rule of court rather than an enactment of Congress. See 18 U. S. C. § 3772 (1982 ed. and Supp. III).

[2] In order to resolve the present cases it is only necessary to decide that the power to prosecute is not part of the "judicial power" conferred on Article III courts. It is not necessary to decide whether the Constitution's vesting of the executive power in the President, Art. II, § 1, cl. 1, forbids Congress from conferring prosecutory authority on private persons. At the time of the Constitution, there existed in England a longstanding custom of private prosecution, see Comment, The Outmoded Concept of Pri-

President.   Art. II, § 2, cl. 1.   See *Heckler* v. *Chaney*, 470
U. S. 821, 832 (1985); *Buckley* v. *Valeo*, 424 U. S. 1, 138
(1976).

These well-settled general principles are uncontested.   The
Court asserts, however, that there is a special exception for
prosecutions of criminal contempt, which are the means of se-
curing compliance with court orders.   Unless these can be
prosecuted by the courts themselves, the argument goes, effi-
caciousness of judicial judgments will be at the mercy of the
Executive, an arrangement presumably too absurd to con-
template.   *Ante*, at 796.

Far from being absurd, however, it is a carefully designed
and critical element of our system of Government.   There
are numerous instances in which the Constitution leaves open
the theoretical possibility that the actions of one Branch may
be brought to nought by the actions or inactions of another.
Such dispersion of power was central to the scheme of form-
ing a Government with enough power to serve the expansive
purposes set forth in the preamble of the Constitution, yet
one that would "secure the blessings of liberty" rather than
use its power tyranically.   Congress, for example, is depend-
ent on the Executive and the courts for enforcement of the
laws it enacts.   Even complete failure by the Executive to
prosecute law violators, or by the courts to convict them, has
never been thought to authorize congressional prosecution
and trial.   The Executive, in its turn, cannot perform its
function of enforcing the laws if Congress declines to appro-
priate the necessary funds for that purpose; or if the courts
decline to entertain its valid prosecutions.   Yet no one sug-

---

vate Prosecution, 25 Am. U. L. Rev. 754, 758 (1976).   I am unaware, how-
ever, of any private prosecution of federal crimes.   The Judiciary Act of
1789 provided for the appointment in each judicial district of "a meet per-
son learned in the law to act as attorney for the United States . . . whose
duty it shall be to prosecute in such district all delinquents for crimes and
offences, cognizable under the authority of the United States."   § 35, 1
Stat. 92; see generally Comment, 25 Am. U. L. Rev., *supra*, at 762–764.

gests that some doctrine of necessity authorizes the Executive to raise money for its operations without congressional appropriation, or to jail malefactors without conviction by a court of law. Why, one must wonder, are the courts alone immune from this interdependence?

The Founding Fathers, of a certainty, thought that they were not. It is instructive to compare the Court's claim that "[c]ourts cannot be at the mercy of another branch in deciding whether [contempt] proceedings should be initiated," *ante*, at 796, with the views expressed in one of the most famous passages from The Federalist:

> "[T]he judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the constitution; because it will be least in a capacity to annoy or injure them. . . . The judiciary . . . has no influence over either the sword or the purse, no direction either of the strength or of the wealth of the society, and can take no active resolution whatever. It may truly be said to have neither Force nor Will but merely judgment; *and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments*." The Federalist No. 78, pp. 522–523 (J. Cooke ed. 1961) (A. Hamilton) (emphasis added).

Even as a purely analytic proposition the Court's thesis is faulty, because it proves too much. If the courts must be able to investigate and prosecute contempt of their judgments, why must they not also be able to arrest and punish those whom they have adjudicated to be in contempt? Surely the Executive's refusal to enforce a judgment of contempt would impair the efficacy of the court's acts at least as much as its failure to investigate and prosecute a contempt. Yet no one has ever supposed that the Judiciary has an inherent power to arrest and incarcerate.

## II

The Court appeals to a "longstanding acknowledgment that the initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function." *Ante*, at 795. Except, however, for a line of cases beginning in 1895 with *In re Debs*, 158 U. S. 564, whose holding and rationale we have since repudiated, no holding of this Court has ever found inherent judicial power to punish those violating court judgments with contempt, much less to appoint officers to prosecute such contempts. Our first reference to the special status of the federal courts' contempt powers appeared in *United States* v. *Hudson*, 7 Cranch 32 (1812), where the question presented was whether circuit courts had the power to decide common-law criminal cases. Congress had not conferred such power, but the prosecution argued that it was part of the National Government's inherent power to preserve its own existence. *Id.*, at 33–34. The Court ruled that such an argument could establish, at most, that *Congress* had inherent power to pass criminal laws, not that the federal courts had inherent power without legislation to adjudge common-law crimes. At the end of its discussion, the Court noted:

> "Certain implied powers must necessarily result to our Courts of justice from the nature of their institution. But jurisdiction of crimes against the state is not among those powers. To fine for contempt—imprison for contumacy—inforce the observance of order, &c. are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others: and so far our Courts no doubt possess powers not immediately derived from statute; but all exercise of criminal jurisdiction in common law cases we are of opinion is not within their implied powers." *Id.*, at 34.

Thus, the holding of *Hudson* was against the existence of broad inherent powers in the federal courts. Its discussion

recognized as inherent only those powers "necessary to the exercise of all others," that is, necessary to permit the courts to function, among which it included the contempt power when used to prevent interference with the conduct of judicial business. It made no mention of the enforcement of judgments, much less of an investigative or prosecutory authority.

Nine years later, in *Anderson* v. *Dunn*, 6 Wheat. 204, 227 (1821), the Court reiterated its view that the contempt power was an inherent component of the judicial power. That case presented an issue more closely related to the questions of the source and scope of the federal courts' contempt power, although still not directly on point: whether the House of Representatives could direct its Sergeant at Arms to seek out a person who had disrupted its proceedings, bring him before the House to be tried for contempt, and hold him in custody until completion of the proceedings. The Court noted that "there is no power given by the constitution to either House to punish for contempts, except when committed by their own members," *id.*, at 225, and that

> "if this power . . . is to be asserted on the plea of necessity, the ground is too broad, and the result too indefinite; . . . the executive, and every co-ordinate, and even subordinate, branch of government, may resort to the same justification, and the whole assume to themselves, in the exercise of this power, the most tyrannical licentiousness." *Id.*, at 228.

Nevertheless, the Court upheld the House's action, concluding that any other course "leads to the total annihilation of the power of the House of Representatives to guard itself from contempts, and leaves it exposed to every indignity and interruption that rudeness, caprice, or even conspiracy, may meditate against it." *Ibid.*

It was in the course of recognizing this limited power of self-defense in the House that the Court pronounced the dictum cited in today's opinion that "[c]ourts of justice are uni-

versally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution." *Id.*, at 227. Read in the context of the case, it seems to me likely that all the Court meant by "mandates" was orders necessary to the conduct of a trial, such as subpoenas. In any event, the statement was not a carefully considered opinion as to the outer limits of the federal courts' inherent contempt powers. As was the case in *Hudson*, moreover, the statement did not suggest that the courts should play any role in the contempt process other than that of neutral adjudicator, and was dictum not only because the judicial contempt power was not at issue but because the Judiciary Act of 1789 had already conferred the authority said to be inherently possessed. § 17, 1 Stat. 83.

I recognize, however, that the narrow principle of necessity underlying *Anderson*—that the Legislative, Executive, and Judicial Branches must each possess those powers necessary to protect the functioning of its own processes, although those implicit powers may take a form that appears to be nonlegislative, nonexecutive, or nonjudicial, respectively— does have logical application to the federal courts' contempt powers. But that principle would at most require that courts be empowered to prosecute for contempt those who interfere with the orderly conduct of their business or disobey orders necessary to the conduct of that business (such as subpoenas). It would not require that they be able to prosecute and punish, not merely disruption of their functioning, but disregard of the *product* of their functioning, their judgments. The correlative of the latter power, in the congressional context, would be an inherent power on the part of Congress to prosecute and punish disobedience of its laws — which neither *Anderson* nor any rational person would suggest. I can imagine no basis, except self-love, for limiting

this extension of the necessity doctrine to the courts alone. And even if illogically limited to the courts it is pernicious enough. In light of the broad sweep of modern judicial decrees, which have the binding effect of laws for those to whom they apply, the notion of judges' in effect making the laws, prosecuting their violation, and sitting in judgment of those prosecutions, summons forth much more vividly than *Anderson* could ever have imagined the prospect of "the most tyrannical licentiousness." *Anderson, supra,* at 228.

### III

Our only holdings conferring an inherent contempt power to enforce judgments emanate from *In re Debs*, 158 U. S. 564 (1895), whose outcome and reasoning we have disapproved. There a Circuit Court, which had enjoined union officers and organizers from engaging in activities disruptive of interstate rail traffic, held them in contempt for failing to comply with the injunction and sentenced them to jail for terms from three to six months. This Court rejected the argument that they had thereby been deprived of their right to a jury trial, stating:

> "[T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court. And this is no technical rule. In order that a court may compel obedience to its orders it must have the right to inquire whether there has been any disobedience thereof. To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency." *Id.,* at 594–595.

At the time, many considered *Debs* a dangerous decision, see Dunbar, Government by Injunction, 13 L. Q. Rev. 347 (1897); Gregory, Government by Injunction, 11 Harv. L. Rev. 487 (1898); Lewis, Strikes and Courts of Equity, 46 Am.

L. Reg. 1 (1898); Lewis, A Protest Against Administering Criminal Law by Injunction, 42 Am. L. Reg. 879 (1894); and the opinion continued to be criticized long after it was handed down. See *Green* v. *United States*, 356 U. S. 165, 193–216, especially 196, and n. 6 (1958) (Black, J., dissenting). Ultimately, its holding was repudiated in *Bloom* v. *Illinois*, 391 U. S. 194 (1968), where we ruled that courts are required to afford persons charged with criminal contempt a jury trial to the same extent they are required to afford a jury trial in other criminal cases. But *Bloom* repudiated more than *Debs'* holding. It specifically rejected *Debs'* rationale that courts must have self-contained power to punish disobedience of their judgments, because "'[t]o submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency.'" 391 U. S., at 208, quoting *Debs, supra,* at 595. The *Bloom* Court, to the contrary, "place[d] little credence in the notion that the independence of the judiciary hangs on the power to try contempts summarily and [was] not persuaded that the additional time and expense possibly involved in submitting serious contempts to juries will seriously handicap the effective functioning of the courts." *Bloom, supra,* at 208–209.

The Court argues that *Bloom* does not control these cases, because "[t]he fact that we have come to regard criminal contempt as 'a crime in the ordinary sense,' *Bloom, supra,* at 201, does not mean that any prosecution of contempt must now be considered an execution of the criminal law in which only the Executive Branch may engage." *Ante,* at 799–800. To this argument it could be added that *Bloom* did not draw the distinction relied on here between the narrow *Anderson* necessity principle, that the courts must be able to conduct their business free of interference, and the broad necessity principle, that courts must be able to do anything required to give effect to their decisions.

While both these points are true, it seems to me that *Bloom* is nonetheless highly relevant to the present cases. First, it eliminates this Court's only holdings that the courts must have autonomous power to hold litigants in contempt as a means of enforcing their judgments. And second, it makes clear that the argument from necessity to the existence of an inherent power must be restrained by the totality of the Constitution, lest it swallow up the carefully crafted guarantees of liberty. 391 U. S., at 209. While this principle may have varying application to the jury-trial and separation-of-powers guarantees, it is inconceivable to me that it would not prevent so flagrant a violation of the latter as permitting a judge to promulgate a rule of behavior, prosecute its violation, and adjudicate whether the violation took place. That arrangement is no less fundamental a threat to liberty than is deprivation of a jury trial, since "there is no liberty if the power of judging be not separated from the legislative and executive powers." 1 Montesquieu, Spirit of the Laws 181, as quoted in The Federalist No. 78, p. 523 (J. Cooke ed. 1961). Moreover, as a practical matter the impairment of judicial power produced by requiring the Executive to prosecute contempts is no more substantial than the impairment produced by requiring a jury. The power to acquit is as decisive as the power not to prosecute; and a jury may abuse the former power with impunity, whereas a United States Attorney must litigate regularly before the judges whose violated judgments he ignores.

Finally, the Court suggests that the various procedural protections that the Constitution requires us to provide contemners undercut the separation-of-powers argument against judicial prosecution. *Ante*, at 799, n. 9. The reverse argument—that the structural provisions of the Constitution were not only sufficient but indeed were the only sure mechanism for protecting liberty—was made against adoption of a Bill of Rights. Ultimately, the people elected to have both checks. The Court is right that disregard of one of these raises less of a prospect of "tyrannical licentiousness" than

disregard of both. But that is no argument for disregard of either.

I would therefore hold that the federal courts have no power to prosecute contemners for disobedience of court judgments, and no derivative power to appoint an attorney to conduct contempt prosecutions. That is not to say, of course, that the federal courts may not impose criminal sentences for such contempts. But they derive that power from the same source they derive the power to pass on other crimes which it has never been contended they may prosecute: a statute enacted by Congress criminalizing the conduct which has been on the books in one form or another since the Judiciary Act of 1789, *supra*, at 821. See 18 U. S. C. § 401.

## IV

I agree with the Court that the District Judge's error in appointing Bainton and Devlin to prosecute these contempts requires reversal of the convictions. The very argument given for permitting a court to appoint an attorney to prosecute contempts—that the United States Attorney might exercise his prosecutorial discretion not to pursue the contemners—makes clear that that is the result required. In light of the discretion our system allows to prosecutors, which is so broad that we ordinarily find decisions not to prosecute unreviewable, see *Heckler* v. *Chaney*, 470 U. S. 821 (1985), it would be impossible to conclude with any certainty that these prosecutions would have been brought had the court simply referred the matter to the Executive Branch.

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, concurring in part and dissenting in part.

In this case, the District Court appointed counsel for a party in a civil suit as a prosecutor in a related criminal contempt proceeding. The Court of Appeals for the Second Circuit found that the District Court did not abuse its discretion in making such an appointment. The Court today reaches a contrary conclusion. I agree that the District Court abused

its discretion in this case, and that, as a general matter, courts should not appoint interested private lawyers to prosecute charges of criminal contempt. But while I agree with the underlying rationale of the Court's opinion, I do not believe that this Court's precedents call for *per se* reversal. I therefore cannot join the Court's judgment.

The ethical rules of the legal profession prohibit representation of two clients who *"may* have differing interests." Ethical Consideration 5–14, American Bar Association, Model Code of Professional Responsibility (1982) (emphasis added). This is the situation the Court today correctly finds to exist. I agree that "the appointment of counsel for an interested party to bring the contempt prosecution in this case at a minimum created *opportunities* for conflicts to arise." *Ante,* at 806 (emphasis in original). A prosecutor occupies a unique role in our criminal justice system and it is essential that he carry out his duties fairly and impartially. Where a private prosecutor appointed by a District Court also represents an interested party, the possibility that his prosecutorial judgment will be compromised is significant. This potential for a conflict of interest warrants an exercise of this Court's supervisory powers to hold that it is improper to appoint such a lawyer to prosecute a charge of criminal contempt.

While the potential for prosecutorial impropriety may justify the conclusion that such appointments are inappropriate, it does not justify invalidation of the conviction and sentence in this case. Even where constitutional errors are found to have occurred, this Court has found harmless-error analysis to be appropriate. *Chapman* v. *California,* 386 U. S. 18 (1967). As the Court recently noted: "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose* v. *Clark,* 478 U. S. 570, 579 (1986).

Here, the error is not of constitutional dimension. Moreover, the defendants had counsel and were convicted of crimi-

nal contempt by an impartial jury. The Court of Appeals found "[no] reason to believe" that the private prosecutor in this case acted unethically. 780 F. 2d 179, 185 (CA2 1985). The court also found the evidence offered at trial "ample" to support the convictions. *Ibid.* These findings strongly imply that the error of appointing the private counsel in this case to prosecute the contempt proceeding was harmless.

Although this Court has the authority to review a record to evaluate a harmless-error claim, *United States* v. *Hasting,* 461 U. S. 499, 510 (1983), I share the Court's concern that the effect of conflicting interests on the integrity of prosecutorial decisions may be subtle. Accordingly, I would remand these cases to the Court of Appeals—in light of our decision today— to determine whether the error of appointing the private attorney to prosecute the contempt proceeding at issue was harmless.

JUSTICE WHITE, dissenting.

I agree with the Court that as a general rule contempt cases such as this should in the first instance be referred to the United States Attorney and that a district court's well-established authority to appoint private counsel to prosecute should be exercised only after that official declines to prosecute. I would also prefer that district courts not appoint the attorney for an interested party to prosecute a contempt case such as this. But as I understand Rule 42, it was intended to embrace the prior practice and to authorize, but not to require, the appointment of attorneys for interested parties. I would leave amendment of the Rule to the rulemaking process. I agree with the Court of Appeals that there was no error, constitutional or otherwise, in the appointments made in this action and that petitioners were not denied due process of law by being tried and convicted of contempt. Because I discern no ground for concluding that petitioners did not receive a fair trial, I would affirm the Court of Appeals.