727 So.2d 463 (1998)
Norma Valencia Bartels de NUNEZ
v.
Eduardo Felipe Valencia BARTELS and Forty One Corporation.
No. 97 CA 1384.
Court of Appeal of Louisiana, First Circuit.
September 9, 1998.
*464 Thomas E. Casey, Jr., Harry S. Hardin, III, Richard C. Badeaux, New Orleans, Thomas E. Engel, James G. McCarney, New York, NY, for Plaintiff/Appellee Norma Valencia De Nunez.
John M. Landis, Rachel W. Wisdom, New Orleans, for Defendant/Appellant Eduardo Felipe Valencia Bartels.
Richard W. Watts, Franklinton, John M. Landis, Rachel W. Wisdom, New Orleans, for Defendant/Appellee Forty One Corporation.
Before FOIL, WHIPPLE and KUHN, JJ.
KUHN, Judge.
Plaintiff, Norma Valencia Bartels de Nunez, filed a rule to enforce a judgment requiring defendant, Eduardo Felipe Valencia Bartels, to comply with a November 15, 1996 decision of this court mandating immediate dissolution of defendant Forty One Corporation ("41 Corp.") and declaring that Norma is entitled to receive corporate funds upon the dissolution. This appeal arises after years of litigation between Venezuelan citizens Norma and Felipe regarding the ownership of bearer shares of 41 Corp., a corporation organized by their now deceased father, Julio Valencia Cardoze, pursuant to the laws of the Republic of Panama ("Panama"). After Julio's death, Norma filed suit in Louisiana against Felipe and 41 Corp. seeking to be declared a one-half owner of the property of 41 Corp., which at that time held assets located in Louisiana, New York and Venezuela. We affirm the April 7, 1997 judgment of the trial court which found Felipe to be in contempt of court, and ordered the execution of two resolutions by the Sheriff for the Parish of Washington, State of Louisiana ("the Sheriff"), which provide for the dissolution of 41 Corp. and the distribution of its funds.

FACTS AND PROCEDURAL BACKGROUND
In an earlier related appeal, this court reviewed the trial court's July 31, 1995 judgment.[1] Therein, the trial court: 1) enjoined *465 Felipe and 41 Corp. from removing assets from any corporate accounts until there had been compliance with all terms of the July 31, 1995 judgment; and 2) ordered Felipe to: a) deliver one-half of the outstanding stock certificates of 41 Corp. to Norma, b) return all funds and assets of 41 Corp. removed by him or at his request or direction to the financial institution where such funds or assets were maintained, with legal interest from the date taken, c) render to Norma an accounting for all transactions of 41 Corp. entered into under the direction of Felipe, and d) take all steps to insure that 41 Corp. and all financial institutions in which 41 Corp. maintains an account or has any monies or assets recognize Norma's one-half ownership interest in the stock of the corporation. Felipe and 41 Corp. devolutively appealed the July 31, 1995 judgment. On or around September 29, 1995, Felipe delivered one-half of the 41 Corp. bearer share certificates to Norma, reserving the right to have the certificates returned upon reversal of the trial court's judgment.
On appeal, we found the trial court properly determined that: 1) Venezuelan law rather than Panamanian law was applicable to determine the validity of a purported donation of 41 Corp.'s bearer shares from Julio to Felipe; 2) the alleged donation of the bearer shares to Felipe by his father was invalid because there was no evidence that the shares were transferred by authentic scripture; 3) Norma and Felipe each became owners of one-half of the shares when Julio died; and 4) mandatory injunctive relief requiring Felipe to return corporate funds to the financial institution where the funds had been maintained, along with legal interest from the date taken, was appropriate. de Nunez v. Valencia Bartels, 95-2577 (La.App. 1st Cir. 11/15/96); 684 So.2d 1001, writ denied, 96-2985 (La.3/7/97); 690 So.2d 15.[2]
In a separate appeal, this court also reviewed the trial court's January 25, 1996 judgment in response to a rule for contempt and/or supplemental relief filed by Norma. Pursuant to that rule, Norma asserted Felipe failed to comply with the provisions of the trial court's July 31, 1995 judgment. Norma sought damages of at least $3.1 million dollars, an amount equal to one-half of 41 Corp.'s assets. Norma sought to recover this sum out of corporate funds located in Louisiana[3] and New York. Norma sought relief via the court's power to order declaratory relief and the court's contempt authority. In the alternative, Norma sought the dissolution of 41 Corp. due to the irreconcilable differences between Felipe and herself.
During the proceedings before the trial court, counsel for Felipe advised the court that Felipe had failed to return corporate funds as ordered. On January 25, 1996, the trial court signed a judgment granting supplemental relief in favor of Norma and against Felipe, which ordered that: 1) 41 Corp. be dissolved and all assets of the corporation be distributed between Norma and Felipe as the two owners of the corporation; 2) Norma was entitled to receive the first $2,756,146.00, plus legal interest on that amount from July 31, 1995, until the date distributed (because Felipe had removed $2,009,000.00 from 41 Corp.'s assets over the past several years, and because legal interest of $747,146.00 had accrued on those sums from the date those sums were removed from 41 Corp. through the date of the July 31, 1995 judgment); and 3) any remaining assets of 41 Corp. shall be divided equally between Norma and Felipe unless additional withdrawals from the 41 Corp. accounts by Felipe are established. On appeal, Felipe and 41 Corp. asserted that the district court did not have the judicial power to order the involuntary dissolution of 41 Corp., citing *466 Wilkinson v. Wogan, 162 La. 133, 110 So. 176 (1926).
Following the holding of Wilkinson v. Wogan, we concluded that the trial court did not have the power to dissolve 41 Corp., and we reversed that portion of the January 25, 1996 judgment which ordered the dissolution of 41 Corp. and the distribution of its assets. However, we also determined that because Felipe had failed to comply with the trial court's previous order to return the assets of 41 Corp., the court had the inherent authority to punish this contempt by declaring that Norma was entitled to receive the first $2,756,146.00 of the 41 Corp. funds (along with legal interest from July 31, 1995, until the date those funds are distributed) upon dissolution of 41 Corp. The trial court's judgment was modified accordingly. We also modified the trial court's judgment to "declare that Norma and Felipe are entitled to receive equal shares of the remaining assets and funds of 41 Corp. upon dissolution of the corporation, unless Norma establishes that additional withdrawals from 41 Corp. accounts and assets have been made by Felipe." (Underlining added.) Upon recognizing the complete lack of accord between Norma and Felipe and the obvious need for the dissolution of 41 Corp., we also amended the trial court's judgment "to order Felipe and Norma to take the necessary legal steps, forthwith, to dissolve 41 Corp. pursuant to the laws of [Panama]." de Nunez v. Valencia Bartels, 96-1266, pp. 10-11 (La.App. 1st Cir. 11/15/96); 684 So.2d 1008, 1013-1014, writs denied, 97-0303, 97-0304 (La.3/7/97); 689 So.2d 1379 and 1380.
On March 24, 1997, Norma filed a "Rule to Enforce Judgment." Therein, she urged that both Panamanian Corporate Law and 41 Corp.'s Articles of Incorporation allow for the immediate dissolution of the corporation upon the execution of a form by the two shareholders, i.e., Norma and Felipe. Norma had made demands on Felipe to sign the form so that the assets could be distributed but he had refused to sign, asserting the dissolution must be by decree of a Panamanian court. Norma sought an order from the district court requiring Felipe to sign the form. Upon his failure to do so within ten days, Norma requested that the court appoint the Sheriff to sign the form acting in Mr. Valencia's stead.
In response to this rule, Felipe claims he is not bound by the previous rulings of the Louisiana courts, asserting Panama has its own legal system and courts with jurisdiction to try these legal matters. Felipe maintains the courts of the state of Louisiana are without jurisdiction to decide this matter.
Dr. Jorge Fabrega, Panamanian counsel for Felipe, filed an action before the Panama Circuit, First Judicial Circuit, Civil Branch. In that action, Felipe's counsel also sought a declaration that: 1) the share ownership of 41 Corp. be determined by Panamanian law; 2) the transfer of the bearer shares of 41 Corp. is made by the delivery of the certificates and governed by Panamanian law even though the initial transfer to Felipe was made outside the Panamanian territory; 3) the transfer of the bearer shares of 41 Corp. to Norma is void; and 4) Felipe is the sole owner of all shares of 41 Corp.
During an April 7, 1997 hearing regarding Norma's rule to enforce the judgment, Dr. Fabrega's March 24, 1997 affidavit was introduced into evidence without objection. In the affidavit, Dr. Fabrega opined that the transfer of ownership of bearer shares of Panamanian corporations is governed by Panama law rather than the location of the shares at the time they are transferred. As such, Dr. Fabrega asserted the earlier judgment of the Louisiana court determining ownership of the bearer shares does not follow Panamanian law and is not enforceable. Dr. Fabrega further asserted that under Panamanian law, Norma has no standing to request dissolution because her mere possession of the shares has not been shown to be valid under the laws of Panama. Dr. Fabrega also contended that Commercial Code Articles 517 and 524 govern the dissolution of 41 Corp. and that the dissolution must be by judicial decree.
Following the April 7, 1997 hearing on the rule for contempt, a judgment was signed on that date which ordered: 1) Felipe is in contempt of the courts of the State of Louisiana, and "specifically, in contempt without limitation of the orders and judgments of *467 [the trial court] and the mandates of the First Circuit Court of Appeal dated November 15, 1996"; 2) due to this contempt, the Sheriff shall execute on Felipe's behalf Resolutions A & B, attached to the judgment, (which provide for the dissolution of 41 Corp. and the distribution of its assets) with the effect being the same as if Felipe himself had signed the resolutions;[4] 3) the resolutions are self-executing and require no further order of any court to enforce compliance by whatever financial institutions are served with a copy of the April 7, 1997 judgment; 4) Felipe, 41 Corp., and their agents, employees, and others acting in concert with them are enjoined from further contesting or relitigating any claims, issues, and controversies finally decided by the courts of Louisiana, "including specifically but without limitation, the jurisdiction of [the trial court] over the parties to this case and the judgments entered herein by [the trial court] and the First Circuit Court of Appeal"; and 5) Felipe and 41 Corp. and their agents, employees, and others acting in concert with them are enjoined from interfering with the dissolution of 41 Corp. and the distribution of its funds pursuant to the judgments of the Louisiana courts and the implementation of the resolutions attached to the April 7, 1997 judgment.
Felipe devolutively appealed the April 7, 1997 judgment asserting that the trial court: 1) lacked subject matter jurisdiction to enter a judgment effecting the distribution of 41 Corp.'s assets to Norma prior to the corporation's dissolution pursuant to the laws of Panama; 2) was barred by the law of the case doctrine from entering a judgment effecting the distribution of 41 Corp. assets without requiring that the corporation first be dissolved pursuant to the laws of Panama; and 3) lacks the judicial power to enjoin Felipe and 41 Corp. from exercising in Panama, New York and Venezuela their rights arising under the laws of other jurisdictions to oppose recognition and enforcement of the 1995 and 1996 judgments of the trial court.

ANALYSIS

Subject Matter Jurisdiction
Relying on Wilkinson v. Wogan, 162 La. 133, 110 So. 176 (1926), and this court's ruling in de Nunez v. Valencia Bartels, 96-1266 (La.App. 1st Cir. 11/15/96); 684 So.2d 1008, writs denied, 97-0303, 97-0304 (La.3/7/97); 689 So.2d 1379 and 1380, Felipe contends the district court does not have subject matter jurisdiction to effect the distribution of 41 Corp.'s assets "unless and until the corporation is dissolved in Panama pursuant to Panamanian law." Felipe asserts the sole purpose of the 1997 judgment is to distribute 41 Corp.'s assets without complying with the legal requirement that the corporation first be dissolved.
Louisiana Constitution, Article 5, Section 16(A)(1), addressing the original jurisdiction of our state's district courts, provides in pertinent part, "Except as otherwise authorized by this constitution or except as ... provided by law ..., a district court shall have original jurisdiction of all civil ... matters." La. Const. Art. 5, § 2 states in pertinent part, "A judge may issue ... orders, and process in aid of the jurisdiction of [the] court."
Louisiana Code of Civil Procedure article 1 provides, "Jurisdiction is the legal power and authority of a court to hear and determine an action or proceeding involving the legal relations of the parties, and to grant the relief to which they are entitled." Jurisdiction over the subject matter is the legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the amount in dispute, or the value of the right asserted. La. C.C.P. art. 2. The jurisdiction of a court over the subject matter of an *468 action or proceeding cannot be conferred by consent of the parties. La. C.C.P. art. 3.
The initial dispute between Norma and Felipe focused on their ownership of 41 Corp. and the corporate funds, some of which were located in a Louisiana bank account. Although an objection to the lack of subject matter jurisdiction is never waived,[5] we note the defendants did not raise assignments of error objecting to the trial court's subject matter jurisdiction in the earlier proceedings before this court. In the March 1997 rule to enforce the judgment, Norma sought a judgment ordering Felipe's compliance with the November 15, 1996 decision of this court mandating immediate dissolution of 41 Corp. and declaring that she is entitled to receive certain funds upon the corporation's dissolution.
As a civil matter, the trial court had jurisdiction over Norma's motion to enforce the judgment pursuant to La. Const. Art. 5, § 16(A)(1). Based on La. Const. Art. 5, § 2, the trial court had the authority to issue orders implementing and enforcing its earlier judgments and orders, as modified by the previous decisions of this court. As we explain more fully below, we find no merit in Felipe's claims regarding subject matter jurisdiction.

Dissolution of the Corporation under Panamanian Law
The Articles of Incorporation of 41 Corp. state that it "may be dissolved at any time by decision of the majority of the Shareholders." Panamanian Corporation Law, Section IX, addresses the dissolution of corporations. Article 80 of that Section provides, in pertinent part:
If the Board of Directors ... may deem it advisable that the corporation should be dissolved, it shall, by a majority of the votes of the members thereof, propose an Agreement of Dissolution and ... shall call... a meeting of shareholders entitled to vote, to decide with respect to the resolution passed by the Board of Directors.
Article 83 states, "Whenever all shareholders having voting power shall consent in writing to a dissolution, no meeting of the Board of Directors or of the shareholders shall be necessary."[6]
Panama's Code of Commerce Article 517 provides:
Companies will end:
1. In the cases foreseen in the Articles of Incorporation;
2. By unanimous consent of the partners[7];

*469 3. By the completion of the business for which they were constituted;
4. By lack or loss of the corporate purpose or because the impossibility to be carried out;
5. By consolidation with one or more companies;
6. By judicial decree.
[Footnote added.]
Panama's Code of Commerce Article 524 states:
A company may be dissolved by judicial decision when its purpose or modus operandi are unlawful or contrary to Law, and in addition when one or more associates may petition it, based on legitimate grounds.
Felipe asserts that 41 Corp. can only be dissolved by judicial decision pursuant to Panama's Code of Commerce Articles 517 and 524, and that a Panamanian court will not accept the "agreement of dissolution" as set forth in the corporate resolutions. Felipe's position is that Panamanian Corporation Law, Section IX, Articles 83 and 84 (applicable to voluntary dissolution), which provide for dissolution by written consent of the shareholders, are not applicable to a "coerced dissolution" or to a dissolution requested by someone who has not shown "true ownership" of the bearer shares of 41 Corp. under Panamanian law. However, counsel for Felipe has acknowledged that "a resolution for dissolution could be adopted at a properly noticed shareholders' meeting" and that "all shareholders having voting power could execute a written consent to dissolution."
In support of his contention, Felipe refers to the expert testimony of Dr. Saul Litvinoff, offered by Norma during a hearing held on January 10, 1996. Dr. Litvinoff testified that based on the lack of accord between 41 Corp.'s two shareholders, Articles 517 and 524 of Panama's Code of Commerce were the relevant articles providing a legal basis for dissolving 41 Corp. under the Panamanian corporation law.[8] Thus, Felipe asserts that Norma initially took the position that 41 Corp. should be judicially dissolved pursuant to Panamanian law.
Norma posits that the "so-called dissolution proceeding" filed by Felipe actually challenges the jurisdiction of the Louisiana courts and seeks to relitigate the issues resolved in the previous litigation. Norma asserts that Felipe refuses to dissolve 41 Corp. by the simplest means possible, i.e., the execution of the resolutions whereby the shareholders agree to the dissolution, and attempts to overturn the judgments and orders of the Louisiana courts. In response to Felipe's argument regarding Dr. Litvinoff's testimony, Norma contends that a judicial decree for a "contested" dissolution under articles 517 and 524 of the Code of Commerce is irrelevant because Felipe has been ordered by this court to dissolve the corporation. Norma urges this matter should not be considered "contested" because Felipe only needs to sign his name to the dissolution paperwork to accomplish the dissolution.

Contempt
After determining Felipe was in contempt of the earlier trial court rulings and the mandates of the November 15, 1996 ruling of this court, the trial court ordered the Sheriff to execute the resolutions providing for the dissolution of 41 Corp. and the distribution of its assets. The trial court designated these resolutions as "self-executing." Felipe contends that the "self-executing" relief granted in the 1997 judgment is precluded by the terms of this court's 1996 judgment (addressing the power of the court to dissolve a foreign corporation), wherein this court held that the trial court did not have the power to dissolve 41 Corp. or to distribute its assets. de Nunez v. Valencia Bartels, 96-1266 at p. 6; 684 So.2d at 1012.
A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. La. C.C.P. art. 221. The trial court is vested with great discretion in determining whether a party should be held in *470 contempt for disobeying the court's orders and its decision will only be reversed when the appellate court discerns an abuse of that discretion. Welborne v. Welborne, 29,479, p. 10 (La.App.2d Cir. 5/7/97); 694 So.2d 578, 584-585, writs denied, 97-1800, 97-1850 (La 10/13/97); 703 So.2d 621 and 623. A finding that a party is in contempt for refusing to obey the orders of a court is not intended to benefit the litigant alleging contempt, although the infliction of a punishment may inure to that party's benefit. The object of a contempt finding is to vindicate the dignity of the court. See Welborne v. Welborne, 694 So.2d at 585.
The authority to punish for contempt of court falls within the inherent power of a court to aid in the exercise of its jurisdiction and to enforce its lawful orders. In re Merritt, 391 So.2d 440, 442 (La.1980). A court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law. La. C.C.P. art. 191.
The court's ability or power to enforce obedience to its orders ensures that the judiciary has a means to vindicate its own authority. Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 796, 107 S.Ct. 2124, 2131-2132, 95 L.Ed.2d 740 (1987). As recognized in Young, this power reaches both conduct before the court and that beyond the court's confines. The underlying concern giving rise to this power "was not ... merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. at 798, 107 S.Ct. at 2132.
Louisiana Code of Civil Procedure article 1878 sets forth:
Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application therefor shall be by petition to a court having jurisdiction to grant the relief. If the application is considered sufficient, the court, on reasonable notice, shall require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith.
Louisiana Code of Civil Procedure article 2504 provides:
If a judgment directs a party to perform a specific act, and he fails to comply within the time specified, the court may direct the act to be done by the sheriff or some other person appointed by the court, at the cost of the disobedient party, and with the same effect as if done by the party.
Louisiana Code of Civil Procedure article 3611 states:
Disobedience of or resistance to a ... final injunction is punishable as a contempt of court. The court may cause to be undone or destroyed whatever may be done in violation of an injunction, and the person aggrieved thereby may recover the damages sustained as a result of the violation.
The trial court found that Felipe failed to comply with the mandates of the Court of Appeal, i.e., that the parties immediately dissolve 41 Corp. and distribute its assets in accordance with the terms of the court's November 15, 1996 decision. In the Panama action, while Felipe sought a judicial dissolution of 41 Corp., he also sought a declaration that share ownership was to be established by Panamanian law and that he was the sole owner of all shares of 41 Corp. Felipe's position is that his request for dissolution of 41 Corp. under the laws of Panama has been made only because he has been compelled to do so by the decision of the Court of Appeal. Moreover, Felipe does not contest that he has refused to sign the resolutions providing for dissolution of the corporation.
Based on these facts, we find no abuse of discretion in the trial court's finding that Felipe has not complied with the mandate of this court that he immediately take the necessary steps to dissolve 41 Corp. Although a judicial decree is one method by which 41 Corp. could have been dissolved under Panamanian law, Felipe clearly acted in bad faith, purposefully causing delay, by refusing to execute the corporate resolutions providing for dissolution. Thus, we find the trial court was statutorily authorized to render a judgment directing the Sheriff to sign the resolutions *471 on Felipe's behalf. La. C.C. P. arts. 2504, 1878, 191, 3611. See de Nunez v. Valencia Bartels, 246 A.D.2d 492, 667 N.Y.S.2d 743 (1/29/98), appeal dismissed, 91 N.Y.2d 952, 694 N.E.2d 879, 671 N.Y.S.2d 711 (4/7/98), leave to appeal denied, 92 N.Y.2d 804, 677 N.Y.S.2d 779, 700 N.E.2d 318 (7/1/98).
The Articles of Incorporation of 41 Corp. authorize the dissolution of the corporation by consent of the shareholders; Panama's Commercial Code Article 517(2) provides for the dissolution of a corporation by the unanimous consent of the shareholders; and Panama's Corporate Law Article 83 provides for dissolution based on the written consent of the shareholders. This court has ordered Felipe to immediately take the necessary steps to dissolve 41 Corp. We find no merit in Felipe's position that he has the right to decline to sign the resolutions authorizing the dissolution of the corporation and that the corporation can only be dissolved by judicial decree in the Panamanian courts, where Felipe intends to relitigate issues regarding applicable law and ownership of the corporate shares. We conclude the trial court had the subject matter jurisdiction to resolve the issues presented before it and to render the judgment of April 7, 1997. The trial court did not order the dissolution of 41 Corp., as asserted by Felipe, but rather ordered that the Sheriff execute the documents required to effect the dissolution under Panamanian law. Since Felipe refused to execute the documents, the trial court was authorized to order the Sheriff to do so in order to enforce the earlier rulings of the Louisiana courts and to preserve the dignity of the Louisiana courts.

Law of the Case
Felipe argues the law of the case doctrine precludes this court from reconsidering its own rulings of law on a subsequent appeal in the same case, citing Louisiana Land and Exploration Co. v. Verdin, 95-2579, pp. 3-4 (La.App. 1st Cir. 9/27/96); 681 So.2d 63, 65, writ denied, 96-2629 (La.12/13/96); 692 So.2d 1067, cert. denied, 520 U.S. 1212, 117 S.Ct. 1696, 137 L.Ed.2d 822 (1997). Felipe contends this court has previously ruled that the assets of 41 Corp. cannot be distributed to its shareholders unless and until the corporation is dissolved pursuant to Panamanian law. Thus, he asserts that previous ruling is the law of the case and precludes the "self-executing" relief granted in the trial court's 1997 judgment.
The law of the case principle is a discretionary guide which relates to: a) the binding force of a trial judge's ruling during the later stages of trial; b) the conclusive effects of appellate rulings at trial on remand; and c) the rule that an appellate court ordinarily will not reconsider its own rulings of law on a subsequent appeal in the same case. It applies to all prior rulings or decisions of an appellate court or the supreme court in the same case, not merely those arising from the full appeal process, foreclosing relitigation of issues previously considered. Id., 95-2579 at pp. 3-4; 681 So.2d at 65. However, the law of the case principle is not applied in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur. The reasons for the doctrine are to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Id.
The issues presented to the trial court during the 1997 trial court proceedings were not the same issues as those presented during the 1995 and 1996 trial court proceedings. We conclude the discretionary "law of the case" doctrine did not preclude the trial court from ordering the relief in question in response to Felipe's contempt of court. Again, we recognize the trial court did not order the dissolution of 41 Corp. but rather ordered that the Sheriff execute the documents required to effect the dissolution under Panamanian law.

Litigation in Other Jurisdictions
Felipe claims the trial court's 1997 judgment improperly enjoins him from asserting his rights in other jurisdictions. The judgment specifically enjoins Felipe and 41 Corp. from further contesting or relitigating in any court of competent jurisdiction "any *472 and all claims, issues, and controversies, now finally decided ... by the courts of the State of Louisiana...." Felipe asserts that he has "substantive and procedural rights under Panamanian law to oppose the recognition and enforcement of the 1995 Judgment and 1996 Judgment [of the Louisiana trial court] on any and all grounds that are available to him under Panamanian law." Felipe also contends he has "substantive and procedural rights under New York law to oppose the recognition and enforcement of the [1995 and 1996 judgments] in New York."
Norma contends that through the Panamanian litigation, filed shortly before the April 7, 1997 contempt hearing, Felipe seeks to overturn the previous orders and judgments rendered by the Louisiana courts. Norma urges that the trial court did not abuse its discretion by enjoining a party subject to the court's personal jurisdiction from committing further contempt.
A trial court has wide discretion to issue appropriate mandatory and prohibitive injunctive orders to respond to contempt. See La. C.C.P. arts. 191, 1878, 3611. Since Felipe's litigation in other jurisdictions is for the obvious purpose of relitigating issues previously decided in the Louisiana courts, we find the injunctive relief granted by the trial court is fully appropriate and within the court's authority. See Hernandez v. Star Master Shipping Corp., 94-1553, pp. 3-4 (La. App. 1st Cir 4/7/95); 653 So.2d 1318, 1320-21 (wherein this court found an injunction was properly granted to prevent a defendant from litigating duplicative and overlapping issues in a foreign court).

CONCLUSION
For the above reasons, we affirm the judgment of the trial court in all respects. We find the relief granted by the trial court is necessary to implement and enforce this court's previous directives. The costs of this appeal are to be paid by defendant-appellant, Eduardo Felipe Valencia Bartels.
AFFIRMED.

APPENDIX A

Norma Valencia Bartels De Nunez

v.

Eduardo Felipe Valencia Bartels

NUMBER: 69,594

22nd Judicial District Court Parish of Washington State of Louisiana

REASONS FOR JUDGMENT
The above-captioned matter came on for bench trial on May 17 and 19, 1995.
Present:
Thomas Casey, Jr., Esq.; Thomas Engel, Esq.; and, James McCarney, Esq., counsel for plaintiff Norma Valencia Bartels de Nunez;
Phillip Wittmann, Esq.; John Landis, Esq.; and, Louis Plotkin, Esq., counsel for defendants Eduardo Felipe Valencia Bartels and Forty One Corporation.
[Mike Cassidy, counsel for the defendant First State Bank in Bogalusa and First State Trust Co. (now owned by Hibernia Bank), was not present, but stipulated that his client would abide by the Court's decision.]
This suit arises out of a dispute between a sister, the plaintiff in this matter, and a brother, the defendant herein, over the ownership of the stock in a corporation owned by their late father Julio Valencia. The father's will, with the exception of a few specific bequests, divides his estate equally between his two children, the parties to this suit. The sister, Norma Valencia Bartels de Nunez, is seeking a declaratory judgment stating that under her father's will she is entitled to one half of the stock in Forty One Corporation, a Panamanian corporation Julio formed in 1987 and funded with approximately $5,000,000.00 or roughly half of the value of his estate at the time of his death.
The brother's defense to this suit is that he is the sole owner of all of the shares of Forty One Corporation, his father having donated the stock to him on November 1, 1989. Julio Valencia died two weeks later on November 15, 1989.
*473 In response to the brother's defense, the sister contends both that the donation was not valid in form, there being no authentic writing memorializing the donation, and that the father had no donative intent. In addition, the sister raises the issue of collation; that is, if the son was given the stock, his rights in it should be subject to her rights of collation.
The pertinent contacts in this case are as follows: the donation is said to have transpired in Venezuela; the father, born in Panama, and never having renounced his Panamanian citizenship, was also a Venezuelan national domiciled in Venezuela for many years and at the time of his death; Julio's only two children, the majors Felipe and Norma, are both residents, domiciliaries and citizens of Venezuela; the father's will was executed in Venezuela; and, the stock transferred was that of a Panamanian corporation. The only contact with Louisiana is that some of the assets of Forty One Corporation were deposited at First State Bank in Bogalusa.

ISSUES:
This case presents three principal issues for the Court to decide, to-wit: 1) Which state's law applies to this case, that of Louisiana, Panama, or Venezuela; 2) Under the chosen law, was there a valid donation by Julio to Felipe of all of the stock in Forty One Corporation; and, 3) What relief should the Court grant.

TESTIMONY OF FACT WITNESSES:
The fact witnesses in this case were few. Mr. Felipe Valencia and Mr. Ramon Franco testified live and Ms. Michele Canora Mayer (hereinafter Ms. Mayer) and Ms. Jilda Brennan testified by deposition.

Mr. Felipe Valencia
Felipe, a forty-eight-year-old, Stanford-educated industrial engineer who is currently engaged in land development, testified that after he finished school he worked in various family businesses. His father regularly called upon him for his advice relative to trading in the stock market, the son having had several courses in finance and accounting. At the time his long-widowed father was diagnosed with cancer in 1988, Felipe was living at his father's home, Villa Norma, his own marriage having ended in divorce.
Felipe testified to several steps taken by his father in the year preceding his death relative to the disposition of his estate. According to Felipe, in the early part of 1989, Jilda Brennan, a Manufacturers Hanover representative met with Julio in Venezuela to discuss setting up a trust for his five grandchildren, two of whom are the plaintiffs children, the other three being the defendant's children. The trust was established on a second visit which Jilda made to Caracas in September of 1989. Julio funded the trust with a million dollars to be divided among the children equally, by head, at a certain age.
Additionally, in mid-1989 Julio changed the board of directors of a holding company of his called Mirantador to exclude the plaintiff from the board, leaving Julio as president and Felipe as the only other director. In his will, after stating that Felipe and Norma "shall participate of my inheritance in equal parts and with the only exception of the legacies I hereinafter appoint," Julio left 51% of the Venezuelan company Mirantador Co. to Felipe and 49% to Norma; additionally, he left all of another Venezuelan company, Solidencia Co., to Norma.
Felipe further testified at trial that prior to his father's making his will on October 26, 1989, he discussed the disposition of the stock of Forty One Corporation with Felipe on two occasions. The first was in the beginning of 1989, in March or April, when "he mentioned something about that he wanted the stocks to go to me. Then a second time, that was around September, something like thatI don't know September or Octoberor in September, he mentioned that the reason why he wanted to give the stocks to me was basically because he was mad [at] my sister and my brothermy brother-in-law for certain things." (Tr. v.2 at 20). The dispute, according to Felipe's trial testimony, was over a business arrangement, and the sum in dispute amounted to between two and four hundred thousand dollars. (Tr. v.2 at 59).
*474 Specifically, the disagreement, between Felipe on one side and Norma and her husband Anibal Nunez on the other, arose out of the management of two family businesses, a fishing company and a plantation. The directors of the plantation corporation were Julio, Felipe, Norma and Anibal. The stock, however, was all in Anibal's namean arrangement which, according to Felipe, was the result of Felipe's impending divorce (Tr. v.2 at 61) and an apparent desire to keep the family business out of the hands of ex-in-laws. After a year and a half, Felipe was operating the plantation and Anibal was running the fishing business. Formerly, the two had divided the profits from the businesses equally. The disagreement arose when Anibal no longer would meet with or talk to Felipe and it escalated to a point where Anibal refused to turn over any of the shares of stock. Julio, in an effort to settle the matter, transferred four hundred thousand dollars to Felipe from a Swiss bank account.
At trial, Felipe was asked whether his father gave him Forty One Corporation to make amends for the behavior of Anibal and Norma, to which he responded that: "In the secondin a second timeas I mentioned before, twice he told me he was going to give me the shares of Forty One Corporation. He wanted me to have the ownership. The second time he said it is when heis when he mentioned that." (Tr. v.2 at 64). The plaintiff then confronted Felipe with his prior answer given at his deposition which was: "He never mentioned in any way that this was a compensation for my loss on the vessel or the plantation at all. Whether it was before that or after that, he simply stated that he wanted to give me the gift of the shares of Forty One Corporation and he never stated in any way the thought that this was to compensate for that. It was more like I was supposed to be the one to realize that that might be the idea behind the gift."
On cross-examination it was brought out that Felipe was asked in his deposition whether his father ever told him why he gave him the stock and his answer was "no." Felipe explained the discrepancy by saying: "The only explanation I can find that in that moment I could have been thinking of the first time that he told me about his desire to give me those shares of the corporation, the ownership of the corporation, and in that moment he didn't give any reasons. That could be the explanation why I'm inconsistent there, at least it looked like it." (Tr. v. 2 at 56). Felipe was also asked at the deposition whether he knew of any reason why his father gave him the stock to which he responded: "I don't have any direct information from my father stating that I'm giving you this as a gift for this reason or for that reason, neither written nor oral." Felipe explained this inconsistency in the same way, that he must have been thinking of the first time his father mentioned the stock. (Tr. v.2 at 57).
In furtherance of this plan to give Felipe the stock, the father, according to Felipe, had the stock brought from New York to Venezuela. In addition, the father ordered that the joint power of attorney held by his daughter and his son for Forty One Corporation be rescinded and that his son be given an individual power of attorney. Julio was to retain his own power of attorney. On November 1, 1989, while on a trip to Caracas, another Manufacturers Hanover representative and Jilda Brennan's subordinate, Ms. Mayer, met with Julio and Felipe to deliver all of the bearer shares of Forty One Corporation stock as well as the paperwork meant to set in motion the desired changes in the powers of attorney.
Ms. Mayer arrived at Villa Norma and was shown in by Felipe. Julio joined the two of them and Felipe testified to the rest of the encounter as follows:
She [Ms. Mayer] started opening the envelope. And at one moment she said, `Here are the shares of Forty One Corporation,' and handed themintended to hand them to my father. I recall my father saying, `Give them to Felipe.' My best recollection is that she did. If my father took them and gave them to me or touched the stock, I don't remember that. After that, then she turned to me the books that I mentioned before concerning Forty One Corporation. And then she brought out the papers to change the powers *475 of attorney, and she also had my father sign that document receiving the stock.
Tr. v.2 at 28. Felipe testified that immediately thereafter he put the shares in a drawer in his room and has since maintained the stock in his possession. When questioned by the Court as to why his father participated in a meeting of the Board of Forty One Corporation later that same day, after the stock was allegedly donated to Felipe, Felipe could not say. Felipe testified that he believed that the ownership of Forty One Corporation was given to him the moment the bearer shares were handed to him, Felipe being familiar with Panamanian corporations since both he and his sister Norma had Panamanian corporations of their own which were formed at the same time Forty One Corporation was formed.
Felipe testified that he did not pay any gift tax on the stock as it was his understanding that stock of a Panamanian corporation could be transferred as a gift tax free. Furthermore, Felipe testified that he did not become aware that his sister was claiming ownership in Forty One Corporation until December in 1992, when she had him served with a New York law suit while he was in Kennedy Airport.
As further evidence that the father intended to give Felipe all of the stock in Forty One Corporation, the defense pointed out that Julio left each of his children exclusive power of a corporation under his will: Felipe was left control of Mirantador Corporation and Norma was left all the stock in Solidencia Co.
Felipe testified that he was present at Villa Norma when his father made his will. Forty One Corporation was not mentioned in the will. Felipe testified that it was not mentioned because it "was given to me by the desire of my father." (Tr. v.2 at 24). However, when the Court pointed out that the will was made on October 26, 1989, and Ms. Mayer did not bring the stock to Venezuela until November 1, Felipe stated that Forty One was not mentioned in the will because his father intended to give him the stock. (Tr. v. 2 at 37).
According to Mr. Valencia's own testimony, his father's estate was worth nearly five million dollars, in addition to the four and one half million dollars in assets that Forty One Corporation held in early 1990. Mr. Valencia testified that he and his sister have, with the exception of one bank account, divided the funds of the other property in accordance with the will.

Mr. Ramon Franco
The defense called their only other live fact witness, attorney Ramon Franco, of the Franco and Franco law firm in Panama. Mr. Franco, whose practice consists almost solely of incorporating Panamanian corporations, testified about the formation and history of Forty One Corporation. In 1987 Jilda Brennan contacted Franco and Franco on behalf of her clients and requested that an offshore corporation be formed for the Valencia's. With respect to the present transaction, the alleged donation, Mr. Franco testified that on November 13, 1989, he received a letter from Jilda Brennan, requesting that the powers of attorney be changed. The paperwork was completed after the death of Mr. Julio Valencia.
The articles of incorporation, found in Exhibit D-2, provide that Forty One Corporation's domicile is in Panama; furthermore, it is Mr. Franco's opinion that the law that applies is the Panamanian corporation law, Law 32 of 1927.

Ms. Jilda Brennan
The testimony of Ms. Mayer's supervisor, Ms. Jilda Brennan, was admitted by way deposition taken November 8, 1993. Since 1983 Ms. Brennan has been an officer at Manufacturers Hanover (now Chemical Bank) in the International Private Banking Division in charge of clients in the Caribbean and Venezuela. She testified that in September 1989, on a regularly scheduled trip to Venezuela to meet with clients, she consulted with Julio Valencia who told her that he wished to get his affairs in order as his health was failing.
At this meeting Julio also advised Jilda that he was concerned about his daughter Norma's marriage, specifically, he was worried that if anything happened to him "that *476 the husband [Anibal] would take over the money and he didn't want it that way." (Depo. of Jilda Brennan at 30). Jilda further testified that Julio's concern about Anibal and Norma was the driving motivation behind his decision to rescind the joint power of attorney for the Forty One Corporation held by Norma and Felipe. (Brennan depo. at 31). Asked explicitly whether Felipe was to keep Norma's share of the property of Forty One Corporation in trust for her, Ms. Brennan answered: "Thatthat I really don't know what the father intended to do with Felipe or with Norma, I really don't know." (Brennan depo. at p. 35).
Ms. Brennan also testified that she was aware only that Ms. Mayer had carried out her assignment by delivering the shares to Julio Valencia; as to what became of the shares after that, she had no knowledge. (Brennan depo. at pp. 39, 64). In February of 1992, Ms. Brennan confirmed Norma's suspicion that her brother had moved a large sum of money, some $500,000, from the Forty One Corporation account. (Brennan depo. at 39). According to Ms. Brennan, Felipe was to take care of his father's wishes after his death, which included "taking care of his sister." (Brennan depo. at 47-48).

Ms. Michele Canora Mayer
The testimony of Ms. Mayer differs somewhat from both Ms. Brennan's and Felipe's. Ms. Mayer's testimony, admitted into evidence by way of a deposition taken on April 28, 1995, shortly before trial, was to the effect that Jilda told her before her trip that she was to take the stock to Julio who wanted the shares in order to give them to Felipe. (Depo. of Canora Mayer, hereinafter "C-M depo.," at 14). Ms. Mayer testified that after arriving at Villa Norma, she met with Julio and Felipe in the living room; Ms. Mayer took the shares and the various attendant documents out and "passed them over to Julio and he took a look at them and he handed it all to Felipe, and I think he signed that he received the things that Jilda had me deliver. They invited me for coffee in the kitchen ." (C-M Depo at 16). On cross-examination, Ms. Mayer admitted that it was possible that she herself handed the shares to Felipe at Julio's behest. (C-M Depo. at 70). The documents other than the stock certificates consisted of a receipt for the stock, a November 1, 1989, cover letter from Julio to Jilda and minutes of the shareholders' meeting of the same date, revoking the power of attorney of the two siblings and creating a power of attorney for Felipe alone, while maintaining the father's power of attorney. These documents, according to Ms. Mayer, were prepared in advance by Jilda and taken to Julio for execution and then brought back to New York to be forwarded to Franco and Franco for processing.
Ms. Mayer further testified that Julio was not feeling well and spoke of being in pain. Specifically, she testified that Julio said something to the effect that "Felipe would handle the company and those things for him..." (C-M depo. at 22). Ms. Mayer admitted that, aside from her meeting with Julio and Felipe at Villa Norma, her information regarding the family all came from Jilda and that Jilda was more familiar with Julio's affairs. (C-M depo. at pp. 53, 67). Ms. Mayer recollected that upon returning, she was told more by Jilda about the possible motivations of Julio. According to Ms. Mayer's recollections, Jilda said that Julio did not trust Norma's husband, Anibal. Ms. Mayer also testified that she thought she remembered Jilda "saying that it had something, that Felipe would eventually give this money to the grandchildren, both his children and Norma's children, but I think that was what she told me, but that was all of the information that I ever had on..." (C-M depo. at 55). In addition, Ms. Mayer recalled that Jilda said something about Julio having given some assets to Norma and others to Julio. CONFLICTS OF LAW (or PRIVATE INTERNATIONAL LAW)
In 1991 the Louisiana Legislature revised, amended, and re-enacted the conflict of laws provisions of the Civil Code. The new law (which applies to this case because suit was filed after January 1, 1992) can be found in Book IV of the Louisiana Civil Code, arts. 3515-3549.
The first article in Book IV, art. 3515, provides the general and residual rules in this area. Thus the article sets out the *477 overarching principle which is that our courts should apply the "law of the state whose policies would be most seriously impaired if its law were not applied to that issue." The article also serves as a residual rule when more specific rules are not provided.
Art. 3515 provides further that the state whose policies would be most seriously impaired if its law were not applied
is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
The Court also notes that in making a choice of law, our law provides that the law chosen is generally only the internal or substantive law of the chosen state rather than that state's choice of law provisions. La. Civ.Code art. 3517. However, art. 3517 (regarding "renvoi") also provides that "in determining the state whose law is applicable to an issue under ... 3537 [conventional obligations],... the law of conflict of laws of the involved foreign states may be taken into consideration." Thus, to the extent that this case involves the conventional obligation of an inter vivos donation, the choice of law principles of the states in question may be considered. This Court finds that the conflicts laws of Venezuela and Panama should be considered because of the minimal contacts this case has with Louisiana.

I. Choice of Law of Venezuela and Panama

A. Venezuelan Choice of Law PrinciplesUnreserved Bustamante Code
Both parties called highly distinguished and scholarly experts in the law. The plaintiff's legal experts, Dr. Gonzalo Parra Arnguren and Dr. Jose Luis Aguilar Garrondona, both testified regarding the Bustamante Code, a comprehensive treaty on choice of law ratified by Panama in its entirety and by Venezuela with only forty-four exceptions the so-called "reserved articles." Dr. Parra testified "that the articles of the Bustamante Code that had not been reserved by Venezuela are in force in the relations between Venezuela and Panama." (Tr. v.1 at 37). Dr. Parra also testified that even in situations where the other state, e.g., the United States, is not signatory to the Bustamante Code, Venezuela would apply the unreserved portion of the Bustamante Code as part of its private international law.
Dr. Parra, who qualified as an expert in the private international lawor conflicts lawof Venezuela, testified that under the Bustamante Code, article 141, donations inter vivos are governed by the same law as contracts. (Tr. v.1 at 37) The Code has one rule for the choice of law regarding the formalities of contracts (arts. 141 and 180 et seq.) and another rule for choice of law regarding the substance of contracts (art. 181 et seq.).

1. Law governing formalities of the contract
With respect to choice of law governing the formalities of a contract, the Bustamante Code provides that the following contacts should be considered: the places where the contract was entered into and where it is to be performed. On cross-examination Dr. Parra testified that the expectations of the parties regarding the formalities of a contract would not be a factor to consider in choice of law on the issue of the formalities because article 187 provides that the parties must comply with the law of the place as to formalities. Thus, Dr. Parra concluded that under the Bustamante Code, a Venezuelan court would apply Venezuelan law regarding the necessary formalities of the contract.

2. Law governing substance of the contract
With respect to the substantive law applicable to a donation inter vivos, Dr. Parra testified that the Bustamante Code provides that the law the parties chose to govern the transaction applies, under articles 184, 185 and 186 of the Bustamante Code. However, if the parties did not choose the law that would *478 apply to the contract, then the Code provides that the "personal law of the parties" is to apply. To determine whether a law was chosen tacitly, a court should look at all of the circumstances of the contract and make a case-by-case decision, according to Dr. Parra.
Dr. Parra conceded on cross-examination that some factors to be considered in determining whether the parties had made a choice of law are the domicile and nationality of the parties; the place of incorporation; the fact that the shares were bearer shares, transferable by delivery; and the expectation of the parties.
In the absence of a shared personal law, the Code provides that the law of the place controls. "Personal law of the parties" is a term which some signatory countries define as the law of the domicile of a party and others as the law of his nationality. Venezuela considers the law of the nationality of the party to be that party's personal law.
In the instant case, the son was a Venezuelan national and the father held duel citizenship, being both a Venezuelan and a Panamanian national. When the parties have a shared personal law, that law applies. Again, Dr. Parra determined that Venezuelan law would apply to the substance of the donation inter vivos because the parties in Dr. Parra's view did not choose a law to apply to their contract of donation and they both share a common personal lawthe law of Venezuela.

3. Law governing succession matters
Dr. Parra also addressed the Bustamante Code's choice of law provision for succession matters, including collation questions, which is found in article 144. This article was reserved by Venezuela and thus would not be used by a Venezuelan court. The reason for the reservation, according to Dr. Parra, was Venezuela's desire that assets in Venezuela be governed by Venezuelan law. According to Dr. Parra, bearer shares of Panamanian stock physically present in Venezuela at the time of the transaction should be considered as having their situs in Venezuela.[1] Using Venezuela choice of law principles relative to a succession matter involving shares of stock physically located in Venezuela, Dr. Parra determined that a Venezuelan court would apply Venezuelan law.

4. Law governing corporation matters
Dr. Parra also addressed the question of the law applicable to the transfer of Panamanian bearer shares. In so doing, Dr. Parra noted that the problem has two components: 1) the relationship between the holder of the shares before the corporation; and 2) the relationship between the parties to the underlying transaction which here was the alleged donation inter vivos. A valid underlying transaction must be found to exist before the question of whether the corporation will recognize the transfer is reached. Dr. Parra concluded that the question of the validity of the underlying transaction is governed by Venezuelan law for the reasons cited above; however, should the transaction prove to be valid, whether the Panamanian corporation would recognize the transaction is a question to be answered under Panamanian law.
On a related topic, Dr. Parra testified on cross-examination that art. 250 of the Bustamante Code relative to the law applicable to issuance of shares speaks to the authority of a corporation to issue certain types of stock and is not relevant to a transfer of stock from one stockholder to another person.
In sum, Dr. Parra found that all the contacts overwhelmingly point to Venezuela, thus, in his view, using either Venezuelan or Panamanian choice of law principles, which are largely the same due to the Bustamante Code, Venezuelan law applies both to the form and to the substance of the contract.

B. Substantive Law of Venezuela

1. Dr. Aguilar's testimony
The plaintiff's expert in the civil law of Venezuela, Dr. Aguilar, testified on two issues: *479 whether the donation inter vivos was valid under Venezuelan law and, if so, whether the donee has an obligation to collate that donation.
According to Dr. Aguilar the Civil Code of Venezuela, article 1439, provides that, for a donation to be valid, it must be made and accepted in writing and in authentic form. The one express exception to this rule is that provided in article 1439 for donations involving personal property with a value of 2,000 bolivars [$12.00] or less. The law of Venezuela does not make an exception for manual gifts as Louisiana law does. Thus, Dr. Aguilar concluded that because the donation in question was not in writing, authentic or otherwise, the formalities of the law of Venezuela were not complied with and the donation is not valid.
On the topic of succession law, Dr. Aguilar stated that even if the donation were somehow valid, the gift would be subject to collation. Dr. Aguilar also explained that while the term "seizin" is not employed, the law of Venezuela has a similar concept which is termed "succession in full right ipso jure." According to Dr. Aguilar this means that where there is, for instance, no contested will, the ownership and the possession of the property in the estate passes to the heirs by operation of law without the need of opening a succession.
Because in Venezuela, as in Louisiana, specific laws control over more general provisions, Dr. Aguilar was questioned about the applicability of a number of special laws that might apply in this case. For instance, he was asked about the bearing on this matter of Venezuelan Civil Code article 794, which states that for a third party, possession of personal assets and bearer certificates is tantamount to title. According to Dr. Aguilar the possession spoken of must be possession in one's own name, not possession for someone else, that is, not what Louisiana might term "precarious possession ." It was his opinion that article 794 was meant to regulate the relationship vis a vis third parties. Dr. Aguilar did not believe that the brother could avail himself of this article relative to his sister.
Similarly, Dr. Aguilar found that neither article 297 of the Venezuela Commercial Code nor the Inter-American Convention on Conflicts applies in this case. Article 297, which provides that bearer shares may be transferred by the act of delivery, is not applicable to this situation in Dr. Aguilar's view because the Commercial Code, in article 1, states that it governs obligations between commercial actors and acts of commerce. And, Dr. Aguilar opined that the Inter-American Convention on Conflicts, which Venezuela ratified but Panama did not, is not applicable because its purpose is to determine matters relating to the capacity of a corporation or "society" and not to decide the validity of acts of shareholders.
When questioned by the Court relative to whether donative intent was necessaryin addition to the requisite formto find a donation valid, Dr. Aguilar indicated that donative intent is indeed required. Dr. Aguilar stated that whether donative intent was present was determined on a case-by-case basis, looking at all of the circumstances surrounding the donation. Regarding who has the burden of proof, Dr. Aguilar opined that "[i]f Norma claims that the donation was not written, then Felipe has to prove that there is a writing concerning the donation." (Tr. v. 1 at 123).
In sum, Dr. Aguilar found that the Civil Code of Venezuela requires that a donation inter vivos must be made in authentic form. This he testified would also be true were the donation remunerative in nature. Dr. Aguilar summed up his position by saying that, because the Civil Code is suppletory, it applies in commercial situations where the Commercial Code does not provide a specific rule.

2. Dr. Pumar's testimony
The defense called Dr. Oswaldo Paez-Pumar, a member at one of the largest law firms in Venezuela, as an expert in the civil law of Venezuela, including contract law and the private international law of Venezuela.
Dr. Pumar was of the opinion that, because the transfer involved an item of commerce (bearer shares), the transfer of the stock in Forty One Corporation should be governed *480 by art. 297 of the Commercial Code. Furthermore, Dr. Pumar testified that art. 297, which provides that bearer shares are transferred by delivery alone, prevails over Venezuelan Civil Code art. 1439 which calls for an authentic written act to effect a donation. In support of his contention, Dr. Pumar points out that art. 297 uses the word transfer at first, and then later in the article, in a part dealing with bearer shares belonging to minors, the word "sale" is used, indicating that the more generic word "transfer" used in the first part of the article can encompass transfers which are not sales, such as donations.
Regarding art. 794 of the Venezuelan Civil Code, Dr. Pumar testified that he did not agree with Dr. Aguilar's testimony that art. 794 does not apply to this case. Although Dr. Pumar did concede that art. 794 was not written with the present situation in mind. Nonetheless, it is Dr. Pumar's contention that, as possessor of the stock, Felipe is presumed to be the owner unless Norma shows he was in bad faith.
On other matters, Dr. Pumar testified that Venezuelan law does not allow for the recovery of punitive damages, an item that plaintiff at one point sought in this matter. With respect to collation, Dr. Pumar testified that in Venezuela the first way to assert your right of collation is to claim it from your debtor, and failing that, you bring suit and specifically plead collation.
On cross-examination, Dr. Pumar testified that he still believed, as he had said in his earlier deposition, that Panamanian law would apply to this transaction and that his trial testimony was given should the Court decide Venezuelan law applies to this case.

C. Panamanian Choice of Law Principles
The defense called Dr. Gilberto Boutin as "an expert in private international law including the application of the Bustamante Code, among the nations that are signatory to the code, as well as the private international law of the Republic of Panama." Dr. Boutin testified that in his opinion the fact that the object of the donation was the stock of a Panamanian company makes the transaction international rather than merely a domestic transaction of interest to Venezuela only.
Dr. Boutin stressed that under Panamanian law it is against public policy not to treat the transfer of Panamanian shares as being governed by Panamanian law. In addition, even under art. 248 of the Bustamante Code, the fact that a corporation is domiciled in Panama is of importance. Moreover, Dr. Boutin did not agree with Dr. Parra's analysis that the transfer of stocks should be broken into two questions, that is, the validity of the transfer relative to the parties and the public and the validity of the transfer in the eyes of the corporation. Dr. Boutin cited article 30 of Law 32 of 1927, the Panamanian corporation law, in support of his contention that public order is violated if Panamanian stocks are subject to different laws whenever they leave the territorial jurisdiction of Panama. Plaintiffs counsel pointed out on cross-examination, that the Panamanian corporation law was adopted on February 26, 1927, and the Bustamante Code was ratified by Panama a year later on February 20, 1928. Dr. Boutin refused to recognize any conflict between the two laws, stating instead that they complement each other.
Dr. Boutin also testified that the concept of donative intent is important under Panamanian law in determining the true owner of stock. (Tr. v.2 at 138).

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Choice of law in succession matters
The Court notes that with regard to succession matters, the Court must use Louisiana conflicts law alone, as La. Civ.Code art. 3517 does not provide that the law of conflicts of law of another state is a factor for this Court to consider in succession cases.
La. Civ.Code art. 3532 provides that: "[e]xcept as otherwise provided in this Title, testate and intestate succession to movables is governed by the law of the state in which the deceased was domiciled at the time of his death." Because the dispute here involves incorporeal movables and Julio Valencia died domiciled in Venezuela, art. 3532 clearly points to the applicability of Venezuelan law.
*481 To the extent the succession issues present broader questions, the Court must look to the general and residual rule of art. 3515 as set forth above. Using art. 3515's analysis, the Court concludes that Venezuela's policies would be most seriously impaired if a dispute between Venezuelan heirs in the succession of a Venezuelan citizen who died domiciled in Venezuela were decided under the laws of another country merely because the item most in dispute happened to be shares of stock in a Panamanian corporation. Much was made by the defense of the expectation of the parties and the delivery of the stock to Venezuela. The Court believes that argument ignores the possibility that Julio had the shares brought to Venezuela to be sure that Venezuelan law would apply, rather than the law of another state, for example, New York. In sum, the Court finds that Venezuelan law applies to any succession issues.

Choice of law in contract matters
The new Louisiana conflicts provisions recognize the possibility of "depecage," which is the term of art for making a choice of law on an issue-by-issue basis. See La. Civ.Code art. 3515 official comment (d). Thus, it is possible that although Venezuelan law will govern the succession law issues, another state's law might control the issue of the validity of the donation. The Court now turns to the question of what law should apply to the contract issue, the validity of the donation.
The defendant has argued that failure to apply Panamanian law to the transfer of Panamanian stock would strike a huge blow to the economy of Panama. This Court does not flatter itself that its decision will have any such global significance.
The Court will, as authorized by La. Civ. Code art. 3517 relative to renvoi, look to the Bustamante Code (B.C.) as a factor to consider in making its choice of law. The Court believes that the B.C. provides the choice of law rules for both Venezuela and Panama on this issue, Dr. Pumar's testimony regarding the earlier Corporation Law of Panama notwithstanding. To recap Dr. Parra's testimony, the B.C. states that donations inter vivos are governed by the same law that governs contracts. In addition, the B.C. has provisions relative to determining the law to govern the form of a contract and determining that which should control the substance of contracts.
Under the B.C. the law of the place where the contract was entered into and where it is to be performed governs the formalities of the contract. The Court finds that the donation, if indeed there was one, was entered into in Venezuela, and, to the extent that a donation is performed, was performed in Venezuela when the stock was handed over to Felipe. Thus, the Court finds that Venezuelan law applies to the form of the donation.
With regard to the substance of the contract, the B.C. provides that the parties may choose the law to govern their transactions. The Court does not find convincing the defense argument that naming Panama as the domicile of the corporation means that the parties wished Panamanian law to apply to the substance of the contract.
The Court must point out here, however, that the principal substantive question to be answered with respect to the donation is whether donative intent is necessary. The Court believes that donative intent is an element which must be proved by the donee under the law of Panama (see defense expert Dr. Pumar's testimony); under the law of Venezuela; and even under the law of Louisiana. Thus, there is what might be termed a "false conflict," because under all of the laws which might be chosen donative intent must be shown. For the sake of completeness, however, the Court finds that the parties did not choose the law that would apply to the contract, and thus the shared personal law of the parties will apply. Because both Julio and Felipe share a common personal law, defined by Venezuela as the law of a person's nationality, the law of Venezuela would apply. Even if Panama defines personal law as the law of domicile, the common domicile is also Venezuela. Thus, it is clear to the Court that under the Bustamante Code and under art. 3515 Venezuela's policies would be most seriously impaired if its law is not applied to the issue of the substantive validity of the *482 donation as well as the formal validity of the contract.

Which Venezuelan law regarding formalities applies
The Court having found that Venezuela's law should apply to the form of the contract, the question remains whether the Commercial Code of Venezuela applies on these facts. Venezuelan law appearing to be very similar to Louisiana law, and not surprisingly given the civil law heritage of both systems, the Court feels it proper to look at Louisiana cases for some guidance.
Our Courts have increasingly recognized the applicability of the Uniform Commercial Code to private transactions. Indeed, our legislature recently enacted La. R.S. 10:3-203(e), codifying much of this jurisprudence. 1994 Acts, No. 249. In Louisiana, donations inter vivos of negotiable instruments are to be governed by the provisions of La. R.S. 10:3-201 et seq., the Civil Code provisions requiring an authentic act notwithstanding. The Act is said to be remedial and retroactive; thus, donations made on or before Jan. 1, 1994, are valid if made in compliance either with the Civil Code or with Title 10.
Our courts have said that "while Louisiana's law of Commercial Paper controls as to the requisite form, the substantive codal provisions relative to the validity of donations inter vivos remain applicable." Succession of Jackson, 537 So.2d 736, 740, n. 6 (La.App. 1st Cir.1988), citing Succession of Jones, 505 So.2d 841, 844 (La.App. 2d Cir.1987). This is not surprising given that "stock transfer legislation is intended to protect third-parties dealing with the apparent owner of a stock." Ackel v. Ackel, 595 So.2d 739, 742 (La.App. 5th Cir.1992). Accordingly, "a court may look to the intent of the parties to the transfer to see if there was a valid transfer of ownership between them. But, even when the stock transfer legislation applies as to the form of the donation, the codal substantive requirements of a divestment, and donative intent, must be fulfilled in order to effect a valid donation." Id. (Citations omitted).
This analysis by the Ackel court brings into sharper focus the argument of defense counsel relative to art. 794 of the Venezuelan Civil Code which, as discussed above, provides for a rebuttable presumption that a possessor is presumed to be the owner. Article 794 of the Civil Code must be meant to protect a third party dealing with a such a possessor. Because Felipe was an actual party to the transaction in question and Julio was the actual owner of the shares of stock, article 794 does not apply to this situation.
The plaintiff's expert in the substantive law of Venezuela, Dr. Aguilar, testified that in his opinion the Commercial Code does not govern donations. Dr. Aguilar cited art. 1 of the Commercial Code which provides that "[t]he Commercial Code governs the obligations of merchants in their mercantile operations and the acts of commerce, even when carried out by non-merchants." (Exhibit P-46). Thus, according to Dr. Aguilar, since a donation is not an act of commerce, it does not come within the purview of the Commercial Code.
Dr. Pumar, on the other hand, felt that the Commercial Code would apply, because the subject of the donation, the bearer shares of stock, are items of commerce, which would make the transfer thereof an act of commerce. Dr. Pumar's careful reading of art. 297 of the Commercial Code, noting that the article employs both the word "transfer" and the word "sale," does leave room for the inference that "transfer" was meant to encompass donations which are not generally commercial.
This Court is inclined to agree with Dr. Aguilar's opinion that the Commercial Code, by its own terms, has no applicability to a donation by a father to his son. Nonetheless, this Court need not reach that issue because the Court concludes that even were the Commercial Code applicable, a donee must still prove donative intent under the substantive requirements of the Venezuelan Civil Code. For that reason, this Court does not decide whether the Commercial Code is applicable here as the Court's finding on the issue of donative intent will be dispositive on the issue of whether there was a valid donation.

*483 Validity of the Donation
Thus, the Court will look at the transaction in question to determine if the defendant has proven that his father intended to donate the stock to him. Evidence of such intent comes from three sources. First, the Court must consider the deposition testimony of Michele Mayer, the only independent witness to the transaction.
The Court notes first that counsel for the plaintiff objected to various hearsay comments and legal conclusions in the deposition of Michele Mayer, including hearsay responses elicited by objecting counsel. Counsel for both parties stipulated that this Court need not rule on each of the evidentiary objections individually. The Court has decided to consider the testimony of Ms. Mayer in its entirety and to accord it the weight it deserves. After viewing of the video deposition as well as reading the transcript thereof, this Court is convinced that Ms. Mayer's testimony regarding her recollection of Julio's motivations, some five years after the events occurred, being based as it is solely on hearsay from Jilda and speculation on the part of Ms. Mayer, is entitled to very little weight. Ms. Mayer's knowledge of Julio Valencia's wishes with regard to the disposition of his estate is sketchy at best.
The Court finds that on November 1, 1989, either Ms. Mayer or Julio handed Felipe all of the shares of stock in Forty One Corporation. The Court does not find that Ms. Mayer offers much if any relevant or reliable information as to why Felipe was given physical possession of the shares. In fact, the only thing Ms. Mayer reports from first-hand knowledge is that Julio said he wanted Felipe to run things for himan ambiguous statement just as consistent with Felipe being the supervisor of what Julio had hoped would be a peaceful succession as it is with Felipe being a donee.
Ms. Brennan, to whom Ms. Mayer deferred in her knowledge of the Valencia's, herself admitted that she did not know what Julio intended to do vis a vis his children except in the most general way. She was not present for the alleged donation, and this Court does not find that her testimony provides much guidance for the Court in determining what Julio Valencia's intent was on November 1, 1989.
The Court is thus left with the testimony of Felipe Valencia. The defendant contended at trial that his father told him on two separate occasions that he wanted him to have Forty One Corporation because of the plantation/fishing vessel dispute which arose between Felipe and the Nunez's.
The Court does not find Felipe's testimony credible for a variety of reasons. First, Felipe's trial testimony and his deposition testimony do not coincide. The Court does not find convincing Felipe's explanation of his failure to mention the reparation motive for the donation at his deposition (namely, that he was thinking of the first time his father mentioned the stock).
The self-serving nature of the testimony is pointed up by the preposterousness of the explanation. That Julio Valencia would give his son half of his estate to compensate him, yet a second time, for a four hundred thousand dollar dispute with Anibal, defies common sense. However, the Court believes that a grain of truth lies at the core of this explanation and that the father may have meant Felipe to hold on to the shares to keep Anibal from gaining control over Norma's portionjust as Anibal was once the nominal owner of the fishing/plantation enterprises to keep Felipe's soon-to-be-ex-wife from siphoning off any of the family money. Even this theory, however, was not proven by a preponderance of the evidence, and if it had been, it would simply show the lack of intent to donate all of Forty One Corporation to Felipe.
The Court also finds it odd that Julio Valencia, with a battalion of bank representatives and attorneys at his beck and call, would dispose of half his estate in such a clandestine manner, leaving no written documentation of his wish that Felipe be sole owner of Forty One Corporation. Rather, Julio's will, preceding the alleged donation so closely in time as it does, seems to be much clearer evidence of Julio's intentions regarding the disposal of his estate. Julio in fact specifically says in his will: "I hereby make a *484 request to my heirs to strictly comply with all the dispositions herein contained."
The Court is also troubled by Julio's instructions on the day of the alleged donation that his power of attorney with respect to Forty One Corporation be maintained, as well as Julio's participation in a shareholders' meeting that day. Such retention of control over the object of a supposed donation indicates a lack of intent to divest himself of that property. Succession of Velasquez-Bain, 471 So.2d 731, 736-7 (La.App. 4th Cir.1985) (Court was "impressed with the fact that the `donor' controlled the Certificate(s) of Deposit up to the time of his death..." and consequently found no donative intent.)
For all of these reasons, the Court finds that Felipe's testimony lacks the necessary indicia of reliability and that donative intent was not proven. In sum, the Court finds there was no valid donation.
When Alexander lay dying in Babylon, in June 323 B.C., Perdiccas, now his senior commander, spent much time at this bedside. The question of the succession was in everyone's mind. It was to Perdiccas, reportedly, that Alexander gave his ring, its seal the symbol of imperial authority; but the ultimate source of that report must have been Perdiccas himself, a fact that does not inspire confidence. And what, even if true, did the gesture signify? Was Perdiccas to be the king's heir, his regent, or nothing more than the supervisor of what he hoped would be a peaceful succession?
P. Green, Alexander to Actium (Berkeley: Univ. of Calif.2d ed. 1993) at 3.

To what relief is the plaintiff entitled?
The only remaining question for the Court is what relief is appropriate.
The defendant contends that, should the Court find that there was no valid donation, the Court should sign a judgment to that effect and deny all other relief sought by the plaintiff. Specifically, the defendant avers that: 1) the plaintiff has not properly raised collation in her petition; 2) the relief in the form of mandatory injunction is improper as it is simply a restatement of the plaintiffs derivative action which she failed to prove at trial; and 3) the plaintiff is not entitled to receive half of Forty One Corporation's assets.
The defendant's arguments regarding collation are moot as the Court has found that there was no valid donation. Based on Dr. Aguilar's testimony that Venezuelan law provides for "succession in full right ipso jure," without the need of opening a succession, this Court finds that it has the power to declare the plaintiff and the defendant to be fifty percent owners of the stock of Forty One Corporation. Accordingly, the Court will find that, under Julio Valencia's will, the plaintiff and the defendant are each entitled to be declared and recognized as half owners of Forty One Corporation.
With respect to the defendant's contention that the plaintiff has an adequate remedy at law in the form of a derivative action but that plaintiff was premature in bringing a derivative action before being declared to be a shareholder, the Court notes that a plaintiff may sue in her individual capacity, rather than as a shareholder on behalf of the corporation, when she personally, as opposed to the corporation as a whole, sustained a loss. Palowsky v. Premier Bancorp, Inc., 597 So.2d 543 (La.App. 1st Cir.1992), citing Wilson v. H.J. Wilson Co., 430 So.2d 1227 (La. App. 1st Cir.). The Palowsky court noted that "[i]n Wilson the plaintiffs claim of breach of fiduciary duty was based upon an allegedly fraudulent transfer to the corporation's principal stockholder of certain shares belonging to plaintiff; in his suit the plaintiff sought recovery of these shares of stock, or the value thereof." The Wilson court held that the plaintiff had a right to sue individually because he sustained a personal loss. Thus, the Court does not find that the plaintiffs action was premature.
The plaintiff argues that La.Code Civ. P. art. 1841 entitles her to mandatory injunctive relief, in the form of ordering the defendant to: deliver her half of the stock; return funds and assets of Forty One Corporation with interest from date taken; and, take all steps to insure that she is recognized as half owner of Forty One Corporation. Art. 1841 *485 provides that "[a] judgment is the determination of the rights of the parties in an action and may award any relief to which the parties are entitled." The plaintiff cites Shipka v. Inserra, 211 Ill.App.3d 735, 156 Ill.Dec. 128, [130], 570 N.E.2d 604, 606 (Ill.App. 1st Dist.1991), in which the court held that "a court in an action for declaratory relief can within its equitable powers give other relief and dispose of issues as necessary. Indeed, it is within the power of the trial court to grant any consequential relief and dispose of the entire controversy." (Citations omitted). In Chauvet v. City of Westwego, 599 So.2d 294, 295 (La.1992) (per curiam), the Court found a mandatory injunction to be proper ancillary relief to an action for declaratory judgment, and ordered "a public official to pay past due sick leave pay and vacation pay."
Accordingly, the Court finds that some of the mandatory injunctive relief sought by plaintiff is appropriate and also necessary to meaningfully adjudicate the parties' rights. The Court will order Eduardo Felipe Valencia Bartels to deliver one half of the Forty One Corporation stock to the plaintiff; to return all funds and assets of Forty One Corporation removed by him or at his request or direction to the financial institution where such funds or assets were maintained, with legal interest from the date taken; to render to the plaintiff an accounting for all transactions of the corporation entered into under the direction of the defendant Eduardo Felipe Valencia Bartels; and, to take all steps to insure that Forty One Corporation and all financial institutions in which Forty One Corporation maintains an account, or has any monies or assets, recognize the one-half ownership interest of Norma Valencia Bartels de Nunez in the stock of Forty-One Corporation.
However, the Court agrees with the defendant that the Court cannot put the plaintiff into possession of one half of the assets of Forty One Corporation absent a petition to dissolve the corporation. Goodover v. Lindey's Inc., 246 Mont. 80, 802 P.2d 1258 (Mont.1990); La.Code Civ. P. art. 1878.
The Court will sign a judgment in accordance with these reasons.
/s/ Covington, Louisiana, this 31 day of July, 1995.
 /s/ Stephen A. Duczer, Judge
 22ND JUDICIAL DISTRICT COURT
 DIVISION "B"
NOTES
[1] The Honorable Stephen A. Duczer was the presiding judge for this judgment and the later-referenced January 25, 1996 judgment.
[2] Pertinent facts were set forth in the trial court's July 31, 1995 reasons for judgment, and the reasons for judgment were designated as Appendix A, and attached to de Nunez v. Valenci[a] Bartels, 95-2577 (La.App. 1st Cir. 11/15/96); 684 So.2d 1001. Since the trial court's reasons for judgment were not made a part of the published appellate court opinion, we again attach the reasons for judgment designated as Appendix A.
[3] In brief, counsel for Norma represents the only remaining 41 Corp. assets are liquid assets in New York bank accounts. Counsel for Felipe represents the Louisiana bank account was seized after entry of the district court's January 25, 1996 decision.
[4] Resolution A, Agreement of Dissolution of (Shareholders), provides that the "undersigned, shareholders of [41 Corp.] ... hereby give our consent for the purposes of dissolving and winding up the affairs of said corporation." Resolution B sets forth that a meeting was held between Norma and Felipe, who unanimously declared that Norma is authorized to liquidate all 41 Corp. accounts and to distribute the proceeds of the accounts as ordered by the Louisiana First Circuit Court of Appeal in its November 15, 1996 judgment. Norma's counsel represents in brief that 41 Corp. was dissolved as between Norma and Felipe when these resolutions were signed by Norma and Felipe's designated representative on April 25, 1997.
[5] A court's subject matter jurisdiction is an issue which cannot be waived or conferred by the consent of the parties. Cf. La. C.C.P. art. 925. The issue addresses the court's authority to adjudicate the cause before it. The issue may be raised at any time, even by the court on its own motion, at any stage of an action. See Tran v. Schwegmann's Giant Super Market, 609 So.2d 887 (La.App. 4th Cir.1992), and cases cited therein.
[6] Panamanian Corporation Law, Section IX, Article 84 provides, "The document wherein the assent of the shareholders to the dissolution is contained shall be protocolized and recorded in the Mercantile Registry and published in the manner established in Article 82 hereof." Article 82 states that once the copy has been filed with the Registry Office, it shall be published at least once in a newspaper of the place where the office of the corporation is located within Panama or when there is no newspaper in that place the copy is to be published in the Official Gazette of the Republic.

In reply to Norma's contention that the certificate of dissolution signed by the sheriff constitutes a written consent of shareholders to dissolve 41 Corp., Felipe urges that Norma has not complied with Panama Corporation Law requiring protocolization and recordation in the registry and publication of shareholders' assent to dissolution. We find that any failure to register or publish the resolutions providing for dissolution of 41 Corp. does not affect Norma and Felipe's rights as between themselves. Equity mandates that the dissolution of the corporation is effective as to Norma and Felipe whether or not the publication and registration requirements of Panamanian Corporate Law have been met. The record does not contain any evidence that the corporation conducts any operations, or has creditors, outstanding debt, or employees. There is no evidence that the dissolution of 41 Corp. would be disadvantageous to anyone other than Felipe, the only party contesting the dissolution.
[7] The parties do not dispute that the English translation of Panama's Corporate Law uses the terms "partners" and "shareholders" interchangeably.
[8] Dr. Litvinoff also testified that there was nothing express in the Panamanian law and no principle of comity that would have prevented the Louisiana trial court from dissolving 41 Corp.
[1] Dr. Aguilar also maintained that the situs of the shares was in Venezuela, citing Bustamante Code article 110 which states that the location of the rights to be exercised with the shares for purposes of international private law is the location of the personal law of the person who owns or possesses the property.